**No. 23-10197 (Lead)**
**Consolidated with No. 23-10198**

# In the
# United States Court of Appeals
# for the Eleventh Circuit

CREATIVE CHOICE HOMES XXX, LLC, et. al.,
*Plaintiffs-Counter Defendants-Appellants,*

v.

AMTAX HOLDINGS 690, LLC, et al.,
*Defendants-Counter Claimants-Appellees.*

Consolidated Appeals from the United States District Court
for the Middle District of Florida, Thomas P. Barber, District Judge
D.C. Nos. 8:19-cv-01903-TPB-AAS; 8:19-cv-01910-TPB-AAS

## APPELLANTS' OPENING BRIEF

David A. Davenport
BC DAVENPORT, LLC
105 5th Avenue South, Suite 375
Minneapolis, MN  55401
(612) 445-8010

*Attorney for Plaintiffs-Counter Defendants-Appellants,*
*Creative Choice Homes XXX, LLC, Creative Choice Homes XXXI, LLC, and*
*Counter Defendant Appellant Impro Synergies LLC*

Nos. 23-10197, 23-10198

*Creative Choice Homes XXX, LLC v. AMTAX Holdings 690, LLC, et al.*
*Creative Choice Homes XXXI, LLC v. MG Affordable Master, LLC, et al.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellants Creative Choice Homes XXX, LLC ("CCH XXX"), Creative Choice Homes XXXI, LLC ("CCH XXXI") and Impro Synergies, LLC ("Impro") certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1. AMTAX Holdings 690, LLC (Defendant/Appellee)

2. Baker, Donelson, Bearman, Caldwell & Berkowitz, PC (Attorney for Defendants/Appellees)

3. Bancroft, Zachary J. (Attorney for Defendants/Appellees)

4. Barber, Hon. Thomas P. (U.S. District Judge for the Middle District of Florida)

5. Barot, Dilip

6. Barot, Naimisha

7. BC Davenport, LLC (Attorney for Plaintiff/Appellant)

8. Bruce, J. Alexandra (Attorney for Defendants/Appellees)

9. Cann, Eve A. (Attorney for Defendants/Appellees)

10. Carlisle, Laura E. (Attorney for Defendants/Appellees)

11. Creative Choice Homes XXX, LLC (Plaintiff/Appellant)

12.   Creative Choice Homes XXXI, LLC

13.   Creative Choice Homes, Inc.

14.   Davenport, David A. (Attorney for Plaintiff/Appellant)

15.   Dix, A. Evan (Attorney for Plaintiff/Appellant and Counter-
      Defendant/Appellant)

16.   Docheva, Desislava (Attorney for Defendants/Appellees)

17.   Flynn, Hon. Sean P. (U.S. Magistrate Judge for the Middle District of
      Florida (originally assigned))

18.   Griffith, Steven F. (Attorney for Defendants/Appellees)

19.   Hill, Ward & Henderson, P.A. (Attorney for Plaintiff/Appellant and
      Counter-Defendant/Appellant)

20.   Hunt Capital Partners, LLC

21.   Hunt Companies, Inc.

22.   Impro Synergies, LLC (Counter-Defendant/Appellant)

23.   Jenkins, Justin H. (Attorney for Plaintiff/Appellant)

24.   McClaren, Scott A. (Attorney for Plaintiff/Appellant and Counter-
      Defendant/Appellant)

25.   MG Affordable Master, LLC

26.   MG GTC Middle Tier I, LLC

27.   MG GTC Fund I, LLC

28.   Moody, Hon. James S. (U.S. District Judge for the Middle District of Florida (originally assigned))

29.   Protech 2005-C, LLC (Defendant/Appellee)

30.   Sansone, Hon. Amanda Arnold (U.S. Magistrate Judge for the Middle District of Florida)

31.   Sundarsingh Law, P.L. (Attorney for Plaintiff/Appellant)

32.   Sundarsingh, Mandell (Attorney for Plaintiff/Appellant)

33.   Zaroogian, Sean M. (Attorney for Plaintiff/Appellant)

## Corporate Disclosure Statement

Appellants hereby certify that, to the best of their knowledge, no publicly traded company or corporation has an interest in the outcome of the case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument on the issues on appeal. The subject matter of the underlying dispute is complex, particularly given the partnerships at issue were formed and operated pursuant to the Low-Income Housing Tax Credit ("LIHTC") program, 26 U.S.C. §42, which governs the unique expectations of and provides context for the parties' various economic sharing agreements held in the partnerships. For instance, Appellees, as passive investors in tax-credit investment vehicles, bargained for federal tax credits and corresponding losses allocated to the partnerships, which they received in exchange for a capital contribution that was significantly less than the substantial tax benefits they consistently received for over more than 15 years. Appellants, on the other hand, developed, operated, and participated in the partnerships and the applicable properties for more than 15 years akin to a traditional real estate investment (not a tax-credit investment), thus their financial benefits are derived from potential cash proceeds and appreciated real estate equity over time. Given the complicated nature of LIHTC partnerships and the LITHC program in general, and the developing body of case law surrounding the LIHTC industry, oral argument may assist the Court in addressing the issues raised on appeal.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS  AND CORPORATE DISCLOSURE STATEMENT ............................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...................................................i

TABLE OF CONTENTS................................................................... ii

TABLE OF CITATIONS .................................................................v

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF THE ISSUES.................................................................2

STATEMENT OF THE CASE...................................................................4

    I.    FACTS...................................................................4

        A.    The Low-Income Housing Tax Credit Program. .......................4

            1.    Background and Congressional Intent.............................4

            2.    The Emergence of Aggregators. ......................................9

        B.    The Partnerships.......................................................13

        C.    The Relevant Terms of the LPAs. .............................................18

            1.    The Options ..................................................18

            2.    Removal Provisions.......................................20

        D.    The Historical Course of Conduct. ...........................................22

            1.    The Limited Partners Received Their Tax Benefits.......22

            2.    The Historic Cash Advances and Annual Accruals. ......23

            3.    The Naimisha Construction Notes.................................26

        E.    Hunt's Removal Efforts. ...........................................................28

            1.    Hunt Acquires Control and Immediately Pursues Removal. ..........................................................28

        2.      Appellants Cure the Breaches While Appellees
                Seek to Prevent the Cures. ...............................................30

    II.     COURSE OF PROCEEDINGS AND DISPOSITION BELOW........35

            A.      Pleadings and Summary Judgment. ..........................................35

            B.      Trial, Judgment, and Motion to Alter or Amend
                    Judgment. ..................................................................................37

    III.    STANDARDS OF REVIEW ................................................................38

SUMMARY OF THE ARGUMENT ....................................................................40

ARGUMENT ........................................................................................................42

    I.      THE DISTRICT COURT ERRED BY CONCLUDING THE
            BREACHES WERE NOT CURED....................................................42

            A.      The Breaches Were Cured. ........................................................42

                    1.      Fountainview. .................................................................44

                    2.      Park Terrace....................................................................45

            B.      Hunt Never Desired or Cooperated with the Cure...................46

    II.     THE DISTRICT COURT ERRED IN CONCLUDING THE
            BREACHES WERE MATERIAL .......................................................49

            A.      Appellees Received Their Essential, Bargained-for
                    Benefits. ....................................................................................50

            B.      The Breaches Had No Detrimental Impact on the
                    Partnerships, the Properties, or the Limited Partners. ..............51

            C.      The Immateriality of the General Partners' Conduct
                    Likewise Requires Reversal of the District Court's
                    Conclusion that the General Partners' Breached their
                    Fiduciary Duties.........................................................................53

    III.    THE DISTRICT COURT ERRED WHEN ENTERING
            JUDGMENTS RESULTING IN EXTREME FORFEITURES .........55

      A.    Appellees' Delay in Enforcing the Breaches............................56

      B.    Appellees were Not Substantially Prejudiced..........................57

      C.    Hunt's Windfall.........................................................................59

   IV.   THE COURT ERRED IN NOT APPLYING WAIVER OR ESTOPPEL........................................................................................60

      A.    Waiver...........................................................................................60

      B.    Estoppel.........................................................................................61

CONCLUSION ...............................................................................................62

CERTIFICATE OF COMPLIANCE ........................................................64

CERTIFICATE OF SERVICE ..................................................................65

## <u>TABLE OF CITATIONS</u>

## CASES

*Acosta v. Dist. Bd. of Trustees of Miami-Dade Comm. Coll.*,
   905 So.2d 226 (Fla. 3d DCA 2005)......................................................................61

*Am. Ins. Co. v. C.S. McCrossan, Inc.*,
   829 F.2d 702 (8th Cir. 1987) ...............................................................................58

*AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp.*,
   15 F.4th 551 (1st Cir. 2021) ........................................................................ *passim*

*AMTAX Holdings 260, LLC v. Washington State Hous. Fin. Comm'n*,
   2021 WL 3738987, (W.D. Wash. Aug. 24, 2021),
   *aff'd*, No. 21-35789, 2022 WL 2953701 (9th Cir. July 26, 2022) ............... 10, 13

*Arch Apartment Management, L.L.C. v. AMTAX Holdings 224, LLC*,
   Ca. No. A19-0421, 2019 WL 4745331 (Minn. Ct. App. 2019)..........................11

*Axis Surplus Ins. Co. v. Caribbean Beach Club Ass'n, Inc.*,
   164 So. 3d 684 (Fla. 2d DCA 2014).....................................................................57

*In re Bal Harbour Club, Inc.*,
   316 F.3d 1192 (11th Cir. 2003)............................................................................54

*Beefy Trail, Inc. v. Beefy King Int'l, Inc.*,
   267 So. 2d 853 (Fla. 4th DCA 1972) ...................................................................53

*Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.*,
   302 So. 2d 404 (Fla. 1974) ............................................................................ 46-47

*Burger King Corp. v. Mason*,
   710 F.2d 1480 (11th Cir. 1983).............................................................................58

*Burlington & Rockenbach, P.A. v. L. Offs. of E. Clay Parker*,
   160 So. 3d 955 (Fla. 5th DCA 2015) ............................................................ 49, 53

*Bush v. Ayer*,
   728 So. 2d 799 (Fla. 4th DCA 1999) ...................................................................60

*Carolina Preservation Partners, Inc. v. Wolf Arbin Weinhold*,
  414 B.R. 754 (M.D. Fla. 2009)...............................................................53

*CED Capital Holdings 200 EB, L.L.C. v. CTCW Berkshire Club, L.L.C.*,
  No. 2018-CA-13886-O, 2023 WL 3093351
  (Fla. Cir. Ct. Apr. 24, 2023) .................................................................29

*CED Capital Holdings 200 EB, L.L.C. v. CTCW Berkshire Club, L.L.C.*,
  No. 2018-CA-013886-O, 2020 WL 6537072,
  (Fla. Cir. Ct. Nov. 3, 2020) *aff'd per curium*, 330 So.3d 991
  (Fl. Ct. App., 5th Dist. Nov. 5, 2021).................................. 9, 12, 19, 32

*CED Capital Holdings X, Ltd. v. CTCW-Waterford East LLC*,
  No. 2019-CA-002758-O, 2023 WL 3436906,
  (Fla. Cir. Ct. May 8, 2023) ............................................................ *passim*

*CED Capital Holdings X, Ltd. v. CTCW-Waterford East LLC*,
  No. 2019-CA-002758-O, 2022 WL 1717946
  (Fla. Cir. Ct. May 12, 2022) ...............................................................12,

*Centerline/Fleet Housing Partnership, L.P. – Series B. v. Hopkins Court
  Apartments, L.L.C.*, Ca. No. 812426/2016, 2020 WL 400742
  (N.Y.Sup., Jan. 07, 2020), *aff'd*, 195 A.D.3d 1375 (N.Y. 4th Dept. 2021),
  *rearg. denied*, 198 A.D.3d 1339 (N.Y. 4th Dept. 2021),
  *leave to appeal dismissed*, 184 N.E.3d 886 (N.Y. 2022) ............................. 10, 19

*Colonial Penn Cmtys., Inc. v. Crosley*,
  443 So.2d 1030 (Fla. Dist. Ct. App. 1983)...........................................61

*CommonBond Investment Corp. v. Heartland Properties
  Equity Investment Fund IV LLC*,
  Ca. No. 62CV138165, 2014 WL 8266277
  (Minn. Dist. Ct. Nov. 14, 2014) .........................................................11

*Covelli Fam., L.P. v. ABG5, L.L.C.*,
  977 So. 2d 749 (Fla. 4th DCA 2008) ..................................................53

*Cox v. CSX Intermodal, Inc.*,
  732 So. 2d 1092 (Fla. 1st DCA 1999) ..................................................47

*Downtown Action to Save Housing v. Midland Corporate Tax Credit XIV, LP*,
Ca. No. C18-0138-JCC, 2019 WL 934887
(W.D. Wash. Feb. 26, 2019)..................................................................11

*Edelstein v. Peninsular Lumber Supply Co.*,
247 So. 2d 721 (Fla. 2d DCA 1971)......................................................62

*Ferndale Labs., Inc. v. Schwarz Pharma, Inc.*,
123 F.App'x. 641 (6th Cir. 2005)..........................................................39

*Fowler v. Resash Corp.,*
69 So.2d 153 (Fla. 3d DCA 1985)..........................................................59

*Frank Felix Associates, Ltd. v. Austin Drugs, Inc.*,
111 F.3d 284 (2d Cir. 1997) .................................................................39

*Hidden Hills Mgt., LLC v. AMTAX Holdings, 114, LLC*,
No. 3:17 CV-06047-RBL, 2019 WL 3297251, (W.D. Wa. July 23, 2019)
*aff'd*, 854 F.App'x. 141 (9th Cir. Mar. 24, 2021) ........................ 10, 54

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
572 U.S. 559 (2014) .............................................................................39

*Homeowner's Rehab, Inc. v. Related Corp. VSLP*,
479 Mass. 741 (2018) ...........................................................................11

*Horatio Enters., Inc. v. Rabin*,
614 So. 2d 555 (Fla. 3d DCA 1993).......................................................57

*Jenkins v. Comm'r, Ala. Dep't of Corr.*,
963 F.3d 1248 (11th Cir. 2020) .............................................................38

*JER Hudson GP XXI LLC v. DLE Invs.*,
275 A.3d 755 (Del. Ch. May 2, 2022)................................................ 8, 12

*Major League Baseball v. Morsani*,
790 So. 2d 1071 (Fla. 2001) .................................................................61

*MDS (Canada) Inc. v. Rad Source Technologies, Inc.*,
720 F.3d 833 (11th Cir. 2013) ..............................................................61

*Morrison v. Mahaska Bottling Co.*,
  39 F.3d 839 (8th Cir. 1994) ...................................................................39

*Multiquimica Dominicana v. Chemo Int'l, Inc.*,
  707 F.App'x 692 (11th Cir. 2017) .........................................................61

*Opa-Locka Community Development Corporation, Inc. v. HK Aswan*, LLC,
  2020 WL 4381624 (Fla. Cir. Ct. July 7, 2020) ....................................10

*Paul v. Hurley*,
  315 So. 2d 536 (Fla. 4th DCA 1975) ....................................................47

*Preferred Sites, LLC v. Troup Cnty.*,
  296 F.3d 1210 (11th Cir. 2002) ............................................................39

*Ramos v. Nw. Mut. Ins. Co.*,
  336 So. 2d 71 (Fla. 1976) ......................................................................38

*Reiterman v. Abid*,
  26 F.4th 1226 (11th Cir. 2022) .............................................................38

*Ron Matusalem & Matusa of Fla., Inc. v. Ron Matusalem, Inc.*,
  872 F.2d 1547 (11th Cir. 1989) ............................................................49

*Roschman Partners v. S.K. Partners I, Ltd.*,
  627 So. 2d 2 (Fla. 4th DCA 1993)........................................................57

*S. Bank Nat. Ass'n ex rel. CW Capital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*,
  138 S. Ct. 960 (2018) ............................................................................38

*Sahadi v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*,
  706 F.2d 193 (7th Cir. 1983) ................................................................57

*Saugatuck, LLC v. St. Mary's Commons Assocs., L.L.C.*,
  No. 2:19-cv-00217, 2023 WL 2698061
  (E.D.N.Y. March 29, 2023) ...................................................... 10, 19, 28

*Sharpe v. Sentry Drugs, Inc.*,
  505 So.2d 618 (Fla. 3d DCA 1987)......................................................59

*Singer v. Singer*,
  442 So. 2d 1020 (Fla. 3d DCA 1983)...................................................60

*State ex rel. Watson v. Gray*,
  48 So.2d 84 (Fla. 1950) ................................................................61

*SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.*,
  33 F.4th 872 (6th Cir. 2022) ......................................... *passim*

*Torres v. K-Site 500 Assocs.*, 6
  32 So.2d 110 (Fla. 3d DCA 1994)........................... 55, 56, 61

*United Auto. Ins. Co. v. Chiropractic Clinics of S. Fla.*,
  322 So. 3d 740 (Fla. 3d DCA 2021)..................................62

*United States v. U.S. Gypsum Co.*,
  333 U.S. 364 (1948) ......................................................38

*Urban 8 Fox Lake Corp. v. Nationwide Affordable Housing Fund 4, LLC*, 334
  F.R.D. 149 (N.D. Ill. 2020) ..........................................11

*Urban 8 Fox Lake Corp. v. Nationwide Affordable Housing Fund 4, LLC*,
  431 F. Supp. 3d 995 (N.D. Ill. 2020)..............................11

*Varel v. Banc One Cap. Partners, Inc.*,
  55 F.3d 1016 (5th Cir. 1995) ................................ 56, 57, 62

*Wesley Hous. Dev. Corp. of N. Virginia v. SunAmerica Hous. Fund 1171*,
  577 F. Supp. 3d 448 (E.D. Va. 2021) ....................... 8, 15, 16

*White v. Brousseau*,
  566 So.2d 832 (Fla. 5th DCA 1990) ..............................55

*World Triathlon Corp, Inc. v. SRS Sports Ctr. SDN.BHD*,
  No. 8:04-cv-1594-T24-TBM, 2005 WL 3445526,
  (M.D. Fla. Dec. 14, 2005) ............................................57

*Worth v. Stuff-Palm*,
  949 So. 2d 1199 (Fla. 4th DCA 2007) ...........................47

*Yellow Pages Photos, Inc. v. Ziplocal, LP*,
  846 F.3d 1159 (11th Cir. 2017).....................................39

## STATUTES

26 U.S.C. §42 ..................................................................................4

26 U.S.C. §42(i)(1) ...........................................................................7

26 U.S.C. §42(j) ..............................................................................22

26 U.S.C. §42(m)(1) ........................................................................14

28 U.S.C. §1291 ................................................................................2

28 U.S.C. §1294(1) ...........................................................................2

28 U.S.C. §1332(a)(2) .......................................................................1

## REGULATIONS

T.D. 8420 (57 F.R. 24749-24750) (Jun. 11 1992) ...........................8

## RULES

Fed. R. App. P. 4(a)(4)(A)(iv) ..........................................................2

Rev. Rul. 79-300 (1979-2 C.B. 112) .................................................8

## OTHER AUTHORITIES

*America's Affordable Housing Crisis: Challenges and Solutions: Senate Hearing 115-288 on S. 548 Before the S. Comm. on Finance*, 115th Cong. (2017) ........................................................................5

City of New York Department of Housing Preservation and Development, *2021 Low Income Housing Tax Credit Qualified Allocation Plan* (Sept. 2021) ...................................................................................12

*Developers Low-Income Housing Tax Credits: Affordable Housing Investment Opportunities for Banks*, Office of the Comptroller of the Currency, (March 2014) ......................................................................... 6, 7, 8

Duong, *Refusing the Right of First Refusal,* Shelterforce
(Oct. 16, 2020) ............................................................................11

Griffith, Carlisle, & Rychlak, *Preserving the Low-Income Housing Tax Credit Public-Private Partnership*, Vol. 31, No. 1, ABA Journal of Affordable Housing & Community Development Law, (2022) .............................................6

H.R. Rep. No. 101-247, 101st Cong., 1st Sess., (1989) ...........................................5

Keightley, *An Introduction to the Low-Income Housing Tax Credit*, Congressional Research Service, (Jan. 26, 2021) ........................................................... 5, 6, 7, 8

Khadduri et al., *What Happens to Low-income housing Tax Credit Properties at Year 15 and Beyond?*, U.S. Department of Housing and Urban Development (HUD), (August 2012)........................................................... 6, 7, 8, 15

Massachusetts Department of Housing and Community Development, *Notice of Funding Availability: March/April 2021* ...........................................................12

Virginia Housing, *Federal Housing Credit Manual* (Jan. 1, 2023) .......................12

Washington State Housing Finance Commission ["WSHFC"], *Bond/Tax Credit Program Polices 2023*, 51-52 (Nov. 17, 2022)....................................................12

Washington State Housing Finance Commission, *Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing*, (September 2019)......................................................... 11, 28

Zaner, *The low-income housing tax credit*, National Real Estate Investor
(April 1, 1996) ...........................................................................8

xi

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(2). In both underlying cases (the "Matters"), Appellants' citizenship is different than Appellees' and the amounts in controversy exceed $75,000.

Appellants are each Florida limited liability companies, of which Dilip Barot is the sole member. Mr. Barot is a Florida citizen residing in Jupiter, Florida. (FV_DE165; PT_DE153)

Impro, a counter-defendant in the Matters, is a Florida limited liability company whose members are Florida citizens. (FV_DE18_12, ¶4; FV_DE30_1, ¶4)

Appellees AMTAX Holdings 690, LLC ("AMTAX") and Protech 2005-C, LLC ("Protech" and together with AMTAX, the "Fountainview LPs") were each Delaware, North Carolina, and Texas citizens when Case No. 8:19-cv-1903 was removed to the District Court. (FV_DE1; FV_DE7; FV_DE10; FV_DE15_1-2; FV_DE166)

Appellee MG Affordable Master, LLC ("MG Affordable") was a citizen of Delaware and Texas; Appellee MG GTC Middle Tier I, LLC ("MG GTC," and together with MG Affordable, the "Park Terrace LPs")[1] was a citizen of Delaware, New York, and Texas; and MG GTC Fund I, LLC was a citizen of Delaware, New

---

[1] Hereafter, the Park Terrace LPs and Fountainview LPs are sometimes referred to collectively as the "Limited Partners."

York, and Texas when Case No. 8:19-cv-1910 was removed.[2]  (PT_DE1; PT_DE7; PT_DE10; PT_DE15_1-2; PT_DE154)

Accordingly, there is complete diversity between Appellants and Appellees. Further, the Matters involve the removal of Appellants from two limited partnerships that own separate affordable housing properties in which Appellants held general partner interests and attendant rights worth millions of dollars that is forfeited unless removal is reversed.  (FV_DE171-71_5, 24; FV_DE171-72_5, 23)

This Court has jurisdiction over the Appeals pursuant to 28 U.S.C. §1291 and §1294(1) because, on April 6, 2022, the District Court entered a final decision and Judgment in each Matter that disposed of all claims, and on December 19, 2022, entered an Order denying Appellants' Motion under Fed. R. Civ. P. 59(e).  (FV_DE173;  PT_DE161;  FV_DE174;  PT_DE162;  FV_DE216; PT_DE204)  The Appeals were timely filed on January 18, 2023.  (Fed. R. App. P. 4(a)(4)(A)(iv); FV_DE217; PT_DE205)

## STATEMENT OF THE ISSUES

Whether the District Court erred by entering Judgments that Appellants[3] were removed from Creative Choice Homes XXX, Ltd. (the "Fountainview Partnership")

---

[2] The District Court dismissed MG GTC Fund I, LLC as a party, and it is therefore not a party to this Appeal.  (FV_173_7, n.4)

[3] Appellants are sometimes collectively referred to hereafter as the "General Partners."

and Creative Choice Homes XXXI, Ltd. (the "Park Terrace Partnership" and together with the Fountainview Partnership, the "Partnerships"), respectively, and Impro was removed as the Partnerships' Management Agent due to the General Partners removal, based upon errors of law and fact, including:

(1)     the District Court's conclusion that the General Partners' breaches of the operative limited partnership agreements (the "LPAs") were not cured, notwithstanding that (a) the General Partners cured the breaches, and (b) the Limited Partners received, deposited and still possess the cure payments, the amounts of which the Limited Partners refused to identify during the cure period (in violation of their duty to cooperate with the General Partners' curative efforts) and *exceed* what the Limited Partners waited to identify ***for the first time at trial*** were necessary to cure the breaches;

(2)     the District Court's conclusion that the General Partners' breaches were material, notwithstanding they involved ***the General Partners'*** bargained-for benefits (*i.e.*, economic benefits) while the Limited Partners had already received their essential, bargained-for benefits under the LPAs (*i.e.*, tax benefits);

(3)     the extreme forfeiture resulting from the General Partners' removal, amounting to nearly ***$9 million*** in benefits they were entitled to receive under the carefully negotiated LPAs, thus constituting a manifest injustice; and

3

(4)    the failure to apply the doctrines of waiver and estoppel to prevent an unjust removal based upon an historic course of conduct, which (i) was disclosed to and acknowledged by the Limited Partners throughout nearly 15 years of operating the Partnerships, and (ii) were only used by Hunt Capital Partners ("Hunt") as a basis to remove the General Partners after acquiring ownership and control of the Limited Partners for a nominal amount under a judicially and industry-wide recognized scheme that has become a matter of great public interest due to a troubling trend working its way through the federal government's Low-Income Housing Tax Credit ("LIHTC") program.

## STATEMENT OF THE CASE

**I.     FACTS**

**A.     The Low-Income Housing Tax Credit Program.**

*1.     Background and Congressional Intent.*

The General Partners formed the Partnerships, and thereafter admitted the Limited Partners into them, to develop, own and operate two affordable housing properties, the Fountainview Apartments ("Fountainview") and Park Terrace Apartments ("Park Terrace," and together with Fountainview, the "Properties"), under the LIHTC program, 26 U.S.C. §42.[4]  Accordingly, the intent of and purpose

---

[4] Fountainview and Park Terrace are located in Tampa and have a combined 348 units providing housing to approximately 870 income-restricted residents. (FV_DE171-1_LimitedPartners0000020        ("Project");        FV_DE171-

4

underlying the LIHTC program is critical to understanding: (i) each party's essential, bargained-for benefits under the LPAs; (ii) the immateriality of the General Partners' breaches; and (iii) the manifestly unjust removal circumstances, which resulted in an extreme forfeiture contrary to Florida law.

Congress created the LIHTC program in 1986 to address the "severe shortage" of affordable housing for low-income people. *America's Affordable Housing Crisis: Challenges and Solutions: Senate Hearing 115-288 on S. 548 Before the S. Comm. on Finance*, 115th Cong. (2017) (Statement of Grant Whitaker, President, National Council of State Housing Agencies). It provides States with an allocation of federal tax credits (the "Credit") to allocate to qualifying projects in the State's discretion. Keightley, *An Introduction to the Low-Income Housing Tax Credit*, Congressional Research Service, at 4-5 (Jan. 26, 2021) (hereinafter, "CRS Report RS22389"). The Credit provides a dollar-for-dollar income-tax reduction and is associated with other tax benefits (including taxable losses and depreciation deductions); thus, the program is designed to incentivize institutional investors (like banks) to invest capital for use in the development of affordable housing. *See* H.R. Rep. No. 101-247, 101st Cong., 1st Sess., at 1188 (1989) (hereinafter, "H.R. Rep. 101-247") (giving "tax incentives to private investors…is the most appropriate way to achieve th[e] aim" of increasing affordable housing).

---

3_LimitedPartners00000141 ("Improvements"); FV_DE221_59:2-9, 68:23-69:2)

Unlike traditional real estate investors, tax-credit investors purchase rights to receive Credits by contributing capital to a specially formed, single-purpose entity (here, limited partnerships) that has received a Credit award and will develop and operate an affordable housing community dedicated to income-restricted residents.[5] Tax-credit investors have large, predictable income-tax obligations, and become passive owners in LIHTC partnerships to be allocated substantially all of the Credits over a ten-year credit period.[6] *See also AMTAX Holdings 227, LLC v. Tenants' Dev. II Corp.*, 15 F.4th 551, 553 (1st Cir. 2021) ("*TDC*").  As the Sixth Circuit recently recognized, tax-credit investors participate in LIHTC partnerships "to reap the benefits from the housing tax credits, not from the Property's long-term appreciation gains," because the "[tax] benefits alone provide the investor with a significant return on investment that makes the arrangement attractive and worthwhile to the investor."  *SunAmerica Hous. Fund 1050 v. Pathway of Pontiac, Inc.* [hereinafter, "*Pathway*"], 33 F.4th 872, 874, 881 (6th Cir. 2022).[7]

---

[5] *See* CRS Report RS22389, at Summary & 1, 5-6; *Low-Income Housing Tax Credits: Affordable Housing Investment Opportunities for Banks*, Office of the Comptroller of the Currency, at 2-3, 14 (April 2014) (hereinafter "Comptroller Report").

[6] *See* Comptroller Report at 3 & n.11, 6, 12, 22; CRS Report RS22389 at 5-6; Khadduri et al., *What Happens to Low-income housing Tax Credit Properties at Year 15 and Beyond?*, U.S. Department of Housing and Urban Development (HUD), at 25, 32 (August 2012) (hereinafter, "Year 15 HUD Report").

[7] *But see* Griffith, Carlisle, & Rychlak, *Preserving the Low-Income Housing Tax Credit Public-Private Partnership*, Vol. 31, No. 1, ABA Journal of Affordable

LIHTC partnerships therefore take on a special form, wherein the ownership entity's other owner(s) are usually a developer (or affiliate) who does not have large, predictable tax obligations and thus "sells" the Credits to a tax-credit investor in exchange for capital, which is combined with traditional debt financing to develop the affordable housing. *Pathway*, 33 F.4th at 874; *TDC*, 15 F.4th at 553-54; *see also* Year 15 HUD Report at 2. These parties serve as general partners and are responsible for, *inter alia*, acquiring the land or property, forming the ownership entity, applying for a Credit allocation through an "extremely competitive" process administered by the States, admitting a tax-credit investor, and operating the housing in accordance with LIHTC requirements for a mandatory 15-year compliance period ("Compliance Period").[8]

In exchange, general partners are granted the right to receive modest fees for work performed, the vast majority of any available cash flow, and, *crucially*, the right to acquire complete ownership of the affordable housing property or the tax-credit investor's interests after the Credits are beyond risk of "recapture" by the government, *i.e.*, after the Compliance Period ends.[9] Tax-credit investors typically

---

Housing & Community Development Law, at 37-39 (2022) (litigation counsel here mischaracterizing tax-credit investments as "a real-estate investment that happens to also provide affordable housing").

[8] 26 U.S.C. §42(i)(1); *see also* Year 15 HUD Report at 5, 25, 56, 77; CRS Report RS22389 at 6; Comptroller Report at 17, 21.

[9] 26 U.S.C. §42(j); Year 15 HUD Report at 1, 56; Comptroller Report at 3.

exit LIHTC partnerships after the Compliance Period ends because "the greatest benefits of ownership" are "both gone and safeguarded," leaving "little economic motivation to stay in the deal," especially when "tax reporting and other administrative burdens" remain.[10]  *See also TDC*, 15 F.4th at 553-54; *JER Hudson GP XXI LLC v. DLE Invs.*, 275 A.3d 755, 761-62, 766-67, 770-74, 778, 796, 798 (Del. Ch. May 2, 2022) ("*JER Hudson*"); *Wesley Hous. Dev. Corp. of N. Virginia v. SunAmerica Hous. Fund 1171* [hereinafter, "*Wesley Housing*"], 577 F. Supp. 3d 448, 453 (E.D. Va. 2021).  These investors do *not* expect material cash returns, but rather tax-related benefits, thus the super majority of economic benefits inures to general partners in LIHTC deals.[11]  *See also Pathway*, 33 F.4th at 874; *TDC*, 15 F.4th at 553-54; Zaner, *The low-income housing tax credit*, National Real Estate Investor (April 1, 1996), https://www.nreionline.com/mag/low-income-housing-tax-credit. ("Investors are not looking at these properties to generate traditional real estate

---

[10] Year 15 HUD Report at 25, 29, 44-45 & n.25; *accord* Comptroller Report at 14.

[11] Year 15 HUD Report at 11, 29, 82; *see also* Comptroller Report at 3 & n.11, 6, 12, 23 ("LIHTC investors receive financial benefits on their investments through the [Credits]…as well as the additional deductions from real estate losses"); CRS Report RS22389 at 5-6 (same).  Notably, the I.R.S permits this purely tax-benefit-based investment—notwithstanding the general rule prohibiting formation of business transactions only to mitigate tax obligations—because this is what Congress intended to allow.  T.D. 8420 (57 F.R. 24749-24750) (Jun. 11 1992) (Credits are allowable even without any other "potential for economic return"); Rev. Rul. 79-300 (1979-2 C.B. 112).

benefits in the same way as conventional multifamily investments – it's not the cash flow they're looking at – but the ability to reduce their federal tax liability.").

2.    *The Emergence of Aggregators.*

Over the last decade, organizations have emerged to disrupt the customary practices within the LIHTC industry and begun systematically interfering with the rights of general partners to the vast majority of economic benefits by (i) assuming ownership and control of limited partner interests in LIHTC partnerships, whether directly or indirectly, and then (ii) "attempt[ing] to extract value out of such interests that were not intended by the original parties to the partnerships." *See CED Capital Holdings 200 EB, L.L.C. v. CTCW Berkshire Club, L.L.C.* [hereinafter, "*CED Berkshire*"], No. 2018-CA-013886-O, 2020 WL 6537072, *5 at ¶¶33-34, *6 at ¶40, *10 at ¶3 (Fla. Cir. Ct. Nov. 3, 2020) (final judgment following a trial involving Hunt, wherein the court recognized such tactics to be part of the "Aggregators' playbook," concluding that "this type of activity has become more common in the LIHTC industry and the Court's decision here [rejecting such efforts] is in accord with decisions from other, similar cases in different jurisdictions"), *aff'd per curiam*, 330 So.3d 991 (Fl. Ct. App., 5th Dist. Nov. 5, 2021); *CED Capital Holdings X, Ltd. v. CTCW-Waterford East LLC* [hereinafter, "*CED Waterford*"], No. 2019-CA-002758-O, 2023 WL 3436906, at *9-13 (Fla. Cir. Ct. May 8, 2023); *see also AMTAX Holdings 260, LLC, at al v. Washington State Hous. Fin. Comm'n*, 2021 WL

9

3738987, at *1 (W.D. Wash. Aug. 24, 2021) (noting that "AMTAX [affiliates in Washington state]…are investor/limited partners in LIHTC partnerships operating housing projects…and have been involved in litigation over control of those LIHTC partnerships in [Washington]") (citing cases), *aff'd*, *aff'd*, No. 21-35789, 2022 WL 2953701 (9th Cir. July 26, 2022) ; *Hidden Hills Mgt., LLC v. AMTAX Holdings, 114, LLC*, No. 3:17 CV-06047-RBL, 2019 WL 3297251, *10 (W.D. Wa. July 23, 2019) (discussing the nefarious "deep dive" practices of Alden Torch Financial, whose founders were former Hunt employees, that are intended to deprive LIHTC general partners of their rights and benefits) *aff'd*, 854 F.App'x. 141 (9th Cir. Mar. 24, 2021).

This Aggregator activity has become common throughout the LIHTC industry and, as recently recognized by a federal court in New York, is a matter of great public interest. *See*, *e.g.*, *Saugatuck, LLC v. St. Mary's Commons Assocs., L.L.C.* [hereinafter, "*St. Mary's*"], No. 2:19-cv-00217, 2023 WL 2698061, at *2 (E.D.N.Y. March 29, 2023) ("the public's particular interest in the issues at the heart of this lawsuit has been well-documented" (citing sources)); *Opa-Locka Community Development Corporation, Inc. v. HK Aswan*, *LLC*, 2020 WL 4381624 (Fla. Cir. Ct. July 7, 2020); *Centerline/Fleet Housing Partnership, L.P. – Series B. v. Hopkins Court Apartments, L.L.C.*, Ca. No. 812426/2016, 2020 WL 400742 (N.Y.Sup., Jan. 07, 2020), *aff'd*, 195 A.D.3d 1375 (N.Y. 4th Dept. 2021), *rearg. denied*, 198 A.D.3d 1339 (N.Y. 4th Dept. 2021), *leave to appeal dismissed*, 184 N.E.3d 886 (N.Y. 2022);

10

*Urban 8 Fox Lake Corp. v. Nationwide Affordable Housing Fund 4, LLC,* 431 F. Supp. 3d 995 (N.D. Ill. 2020); *Urban 8 Fox Lake Corp., v. Nationwide Affordable Housing Fund 4, LLC*, 334 F.R.D. 149, 164-65 (N.D. Ill. 2020); *Downtown Action to Save Housing v. Midland Corporate Tax Credit XIV, LP*, Ca. No. C18-0138-JCC, 2019 WL 934887 (W.D. Wash. Feb. 26, 2019); *Arch Apartment Management, L.L.C. v. AMTAX Holdings 224, LLC,* Ca. No. A19-0421, 2019 WL 4745331 (Minn. Ct. App. 2019); *Homeowner's Rehab, Inc. v. Related Corp. VSLP*, 479 Mass. 741, 743-46 (2018); *CommonBond Investment Corp. v. Heartland Properties Equity Investment Fund IV LLC,* Ca. No. 62CV138165, 2014 WL 8266277 (Minn. Dist. Ct. Nov. 14, 2014).[12]

As a Florida court observed earlier this year, this troubling trend "has intensified" in recent years. *CED Waterford*, 2023 WL 3436906, at *11. Hunt is intimately involved in this trend, having adopted a *modus operandi* that includes attempting to remove LIHTC general partners to deprive them of their post-Compliance Period rights to exit tax-credit investors. *See generally CED Berkshire*,

---

[12] *See also* Washington State Housing Finance Commission, *Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing*, 1-6 (September 2019) (the "WSHFC Report"), http://wshfc.org/admin/Reporton15YearTransferDisputes.pdf; Duong, *Refusing the Right of First Refusal,* Shelterforce (Oct. 16, 2020), https://shelterforce.org/2020/10/16/refusing-the-right-to-refuse/.

2020 WL 6537072; *JER Hudson*, 275 A.3d at 771-74; *CED Waterford*, No. 2019-CA-002758-O, 2022 WL 1717946 (Fla. Cir. Ct. May 12, 2022).

Accordingly, State agencies overseeing and regulating local implementation of the LIHTC program are taking action. *See*, *e.g.* Washington State Housing Finance Commission ["WSHFC"], *Bond/Tax Credit Program Polices 2023*, 51-52 (Nov. 17, 2022), https://www.wshfc.org/mhcf/4percent/2023BondPolicies.pdf (Chapter 7); Massachusetts Department of Housing and Community Development, *Rental Housing Rapid Production Initiative, Notice of Funding Availability*, §III (March/April 2021), https://www.mass.gov/doc/nofa-rental-housing-rapid-production-initiative/download (to obtain a Credit allocation, the "investor cannot have been involved in any 'aggregator' activity, in Massachusetts or in other states"); City of New York Department of Housing Preservation and Development, *2021 Low Income Housing Tax Credit Qualified Allocation Plan*, 19-20, ¶8 (Sept. 2021), https://www1.nyc.gov/assets/hpd/downloads/pdfs/services/2021-official-qualified-allocation-plan.pdf ; Virginia Housing, *Federal Housing Credit Manual*, 24, §7.1.13 (Jan. 1, 2023), www.virginiahousing.com/en/partners/rental-housing/rental-housing-tax-credits ("Tax Credit Manual" link). Even then, Aggregators fight to prevent these protective measures and intimidate the affordable housing community into succumbing to their avaricious behavior so they can continue to plunder LIHTC partnerships without restraint. *See, e.g.*, *AMTAX*

*Holdings 260 LLC*, 2021 WL 3738987 at *1-2 (dismissing attempt to enjoin the WSHFC's rule change).

Despite all of this and such being germane to Appellants' equitable claims and defenses, especially to the extreme removal remedy resulting in forfeiture, the district court limited Appellants' ability to develop this evidence at trial (as discussed below).  (*See* FV_DE223_522:7-524:19)

**B.    The Partnerships.**

Before removal in the Fountainview Partnership, CCH XXX was general partner, AMTAX the Investor Limited Partner, and Protech the Special Limited Partner.  (FV_DE171-1_LimitedPartners0000003)  Similarly, in the Park Terrace Partnership, CCH XXXI was general partner, MG GTC[13] the Investor Limited Partner, and MG Affordable[14] the Special Limited Partner.  (FV_DE222_421:2-4; FV_DE171-3_LimitedPartners0000125)  Impro was the property manager for the Partnerships and Creative Choice Homes, Inc. ("CCH Inc.")[15] was the Developer who received fees from available cash flow for its work.  (FV_DE221_75:3-80:18)

---

[13] MG GTC is the successor-in-interest to CTCW–Creative Choice Homes XXXI LLC, and thus references to "MG GTC" incorporates both entities.  (PT_DE18-4_PageID605-08)

[14] MG Affordable is the successor-in-interest to Column Affordable Master, LLC, and thus references to "MG Affordable" incorporates both entities. (PT_DE18-4_PageID573, 603)

[15] CCH Inc. is an affiliate of the General Partners and is owned by Dilip Barot and his wife.  (FV_DE222_352:16-23; *see also* FV_DE221_45:4-46:10)

Before he admitted the Limited Partners into the Partnerships, Mr. Barot was the sole limited partner and invested the necessary seed capital to apply for Credits from the Florida Housing Finance Agency ("FHFA"), including costs to: (i) secure the real estate, to perform due diligence and comprehensive market studies for the "qualified allocation plans" required by 26 U.S.C. §42(m)(1); and (ii) obtain professional services necessary for preparing the Credit applications (e.g., legal, financial, real estate, and architectural services). (FV_DE221_47:17-49:2, 49:22-52:18) After FHFA awarded Credits, Mr. Barot "sold" the allocation rights to receive the Credits to tax-credit investors (through the ILPs) to aid in financing the Properties' development. (FV_DE221_52:19-53:5, 61:17-62:9) The LPAs were thus negotiated to admit the Limited Partners into, and withdraw Mr. Barot from, the Partnerships, leaving entities affiliated with him in the Partnerships. (*See* FV_DE171-1_LimitedPartners0000003; FV_DE171-3_LimitedPartners0000131)

The Fountainview Partnership's LPA (the "FV LPA") is dated December 21, 2005, and the Park Terrace Partnership's LPA (the "PT LPA") is dated January 1, 2007. (*Id.*) The ILPs were entitled to over 99.9% of the respective Partnerships' Credits and taxable losses, and their capital contributions were calculated based upon a discount to the total Credits they would receive. (FV_DE171-1_LimitedPartners0000074-75, §11.1(a); *id.*_LimitedPartners0000101, Exhibit A ("Percentage Interests"); *id.*_LimitedPartners0000111-12 (Exhibit F); FV_DE171-

3_LimitedPartners0000201, §10.7D(i))    Thus, AMTAX contributed capital to Fountainview based upon a formula of $0.96 per Credit dollar to be received and MG GTC contributed capital to Park Terrace based upon a $0.98 per Credit dollar formula.    (FV_DE221_101:3-105:13, testifying about FV_DE171-1_LimitedPartners0000111-12 (Exhibit F) and *id.*_LimitedPartners0000044-45, §5.1(d)(i)-(ii); *see also* FV_DE221_114:23-116:12, testifying about FV_DE171-3_LimitedPartners0000154, §3.5B; FV_DE171-2_BTUS003205)    If FHFA subsequently reduced or increased the Credits awarded, then the ILPs' capital contribution obligations would be reduced or increased using the same formula.  (*Id.*)  Similarly, after the ILPs' capital contributions were complete, if Credits did not get allocated or were recaptured by the IRS for some reason, then the General Partners were obligated under guaranty agreements to reimburse the ILPs for their contributions. (FV_DE222_366:10-16; FV_DE171-1_LimitedPartners0000059-60, §8.8(c); FV_DE171-3_LimitedPartners0000174, §4.10.D) Plainly, as HUD, various courts, and the LPAs establish, the Credits and taxable losses were the ILPs' primary economic incentive under the LPAs.  Year 15 HUD Report at 25, 32; *Pathway*, 33 F.4th at 874-75; *TDC*, 15 F.4th at 553-54; *Wesley Housing*, 577 F. Supp. 3d at 453-54.

Accordingly, AMTAX's "Investment Assumptions" attached to the FV LPA includes "Projected Value of Tax Credits, Tax Losses, and Cash Flow," which

15

further demonstrate how the tax savings from Credits and losses establish essentially *all* of AMTAX's anticipated benefit from the Fountainview Partnership, with only $3,436 in anticipated cash flow from 2005 to 2021. (FV_DE171-1_LimitedPartners0000111-12 (Exhibit F))[16]

While Appellees became passive tax credit investors with limited rights,[17] the General Partners remained responsible for the Partnerships' day-to-day operations under the LPAs and undertook nearly all of the risk associated with operating the Partnerships, including guaranteeing: (a) construction completion and funding of construction cost overruns; (b) to fund operating deficits; and (c) the ILPs' receipt of the Credits in proportion to the agreed upon formulas. (FV_DE221_86:6-88:20; FV_DE171-1_LimitedPartners0000053, §8.1(a); *id.*_LimitedPartners0000057-59, §8.8(a)-(d); FV_DE171-3_LimitedPartners0000161-62, §4.1.A; *id.*_LimitedPartners0000173-74, §4.10) In exchange, Appellants bargained for and received the vast majority of the Partnerships' economic benefits, including: (1) the

---

[16] For their part, Protech and MG Affordable were admitted to the Partnerships as Special Limited Partners, having limited oversight rights to ensure the ILPs received their bargained-for Credits and losses. (FV_DE221_95:14-96:6; *see also* FV_DE171-1_LimitedPartners0000054-55, §8.2(b); *id.*_LimitedPartners0000086, §13.4(b)(ii)-(iii), (v); *id.*_LimitedPartners0000101; FV_DE171-3_LimitedPartners0000167-69, §4.4.B; *id.*_LimitedPartners0000215, §14.3.C; *id.*_LimitedPartners0000225)

[17] FV_DE222_421:25-422:11; *see also Pathway*, 33 F.4th at 874-75, 881; *TDC*, 15 F.4th at 553-55; *Wesley Housing*, 577 F. Supp. 3d at 453.

right to 90% of (a) any annual cash flow remaining after operating expenses and certain obligations are paid, and (b) any residual sale or refinancing proceeds; and (2) an option to purchase either the Properties or the Limited Partners' interests in the Partnerships after the Compliance Periods ended (the "Options"). (FV_DE171-1__LimitedPartners0000074-75, §11.1(a), *id.*_LimitedPartners0000078-79, §11.4; *id.*_LimitedPartners0000069, §8.20; FV_DE221_100:2-18; FV_DE171-3_LimitedPartners0000194-96, §§9.1-9.2; *id.*_LimitedPartners0000176, §4.15; FV_DE171-2_BTUS003208)  When Mr. Barot agreed to admit the Limited Partners' into the Partnerships, their admissions were conditioned upon agreement to the Options, whereby the General Partners secured entitlement to acquire the vast majority of the Properties' built-up equity resulting from their efforts to develop them and operate the Partnerships during the Compliance Periods. (*See* FV_DE221_90:3-24)  As the Sixth Circuit has recognized, this careful balance of tax credit benefits (to the tax-credit investor) and allocation of the super-majority of economic benefits (to the general partner), along with an efficient process to exit tax-credit investors after Compliance Periods end, is "***crucial to the efficacy of the LIHTC program***." *Pathway*, 33 F.4th at 875.[18]

---

[18] Unless provided otherwise, all ***emphasis*** is added.

**C.    The Relevant Terms of the LPAs.**

*1.    The Options*

Fountainview

Under Section 8.20 of the FV LPA, CCH XXX has the right, ***provided it remains the general partner***, to purchase Fountainview or the Fountainview LPs' partnership interests after the Compliance Period ends.    (FV_DE171-1_LimitedPartners0000069, §8.20(a)-(b))   The purchase price for Fountainview equals the greater of (i) "the sum of the outstanding indebtedness on the Project…plus all federal, state and local taxes imposed on the Limited Partners attributable to the [Option]" (the "debt-plus-taxes price"), or (ii) Fountainview's fair market value.  (*Id.*_LimitedPartners0000069, §8.20(b))  The purchase price for the Fountainview LPs' interests equals the amount they would "otherwise receive pursuant to the terms of this Agreement under Section 11.4 if [Fountainview] were sold at the price described immediately above in clause (i) and assuming reasonable costs of sale." (*Id.*)

Under Section 11.4, commonly referred to as a "Waterfall" provision, CCH XXX is entitled to receive approximately 90% of the amount of sale proceeds remaining after all outstanding debts and obligations are satisfied through a cascading set of considerations.    (*Id.*_LimitedPartners0000078-79, §11.4) Accordingly, regardless of which Option is pursued, the Fountainview LPs receive

*only* approximately 10% of available sale proceeds. This Waterfall dynamic preserving the super-majority of economic benefits after the end of the Compliance Period for CCH XXX is common in the LIHTC industry and its application has been uniformly confirmed when challenged by Aggregators, including by Florida courts. *See CED Berkshire*, 2020 WL 6537072, at *2, ¶5, *9, ¶62, *10-11, ¶¶1-6, 8; *CED Waterford*, 2022 WL 1717946, at *7, 10-11; *CED Waterford*, 2023 WL 3436906, at *2, ¶¶3-5, *4-5, ¶¶17-23, *6-7, ¶¶38-39; *Centerline/Fleet Housing Partnership, L.P.-Series B v. Hopkins Court Apartments, L.L.C.*, 195 A.D.3d at 1377; *St. Mary's*, 2022 WL 3699484, at *7-8; *see also* FV_DE223_494:15-495:11.

Park Terrace

Under Section 4.15 of the PT LPA, CCH XXXI has the right, ***provided it remains the general partner***, to purchase Park Terrace or the Park Terrace LPs' partnership interests after the Compliance Period ends. (FV_DE171-3_LimitedPartners0000176, §4.15(A)-(C)) The purchase price for Park Terrace equals the greater of (i) the debt-plus-taxes amount, or (ii) Park Terrace's fair market value. The purchase price for the Park Terrace LPs' interests equals the amount the Park Terrace LPs "would otherwise receive pursuant to the terms of this Agreement under Section 9.2 if [Park Terrace] were sold at the price described immediately above in clause (i) or (ii) above, as applicable." (*Id.*, §4.15(C)) Section 9.2 of the

19

PT LPA is the sale proceeds Waterfall, which also preserves approximately 90% of residual sale proceeds for CCH XXXI. (*Id.*_LimitedPartners0000195-96, §9.2)

Keenly relevant here, just like in the FV LPA, is the requirement that CCH XXXI must be the general partner to exercise the Option. Indeed, modeling of a hypothetical sale of the Properties using their 2019 fair market values (when the Matters commenced) reveals: (i) Appellants' entitlement to approximately $2.3 million in built-up equity in Fountainview and $6.5 million in Park Terrace under the Options, once ripe, and (ii) why Hunt pursued removal for immaterial breaches that had been ongoing and were otherwise not acted upon until shortly after Hunt became involved in the Partnerships. (FV_DE171-71_PageID6052-53, 6064; FV_DE171-72_PageID6084-85, 6095; FV_DE221_98:5-99:18, 129:10-130:8; FV_DE223_494:11-495:11, 501:7-502:3; Facts_Section E, *infra*)

        2.    *Removal Provisions*

<u>Fountainview</u>

Section 8.15(a) of the FV LPA allows the Fountainview LPs to remove CCH XXX as the general partner:

> (vi)    for any intentional misconduct, malfeasance, fraud, act outside the scope of its authority, breach of fiduciary duty, or any failure to exercise reasonable care with respect to any material matter in the discharge of its duties and obligations as General Partner (provided that such violation results in, or is likely to result in, a ***material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership***)…, or

(ii)    upon the occurrence of any of the following:

…    (B) the General Partner shall have violated any ***material*** provision of this Agreement … (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership)…

(FV_DE171-1__LimitedPartners0000065-66, §8.15(a)(i), (a)(ii)(B))

Protech must provide notice "of its determination that cause for removal of [CCH XXX] exists," after which CCH XXX has 30 days to cure, plus an additional 60 days if it begins to cure within the initial period (thus a total of ***90 days***), "in which event it shall remain as General Partner."    (*Id.*_LimitedPartners0000067, §8.15(b))

### Park Terrace

Under Section 12.7 of the PT LPA, MG Affordable can remove CCH XXXI as the general partner "if a Material Default occurs and is not cured within the time period set forth in this Section 12.7," including:

(vi)    a breach by any General Partner…which has, or may reasonably be expected to have, ***a material adverse effect on the Partnership, the Apartment Complex or the Investor Limited Partner***.

…

(vi)    gross negligence, fraud, willful misconduct, misappropriation of Partnership funds, or a breach of fiduciary duty by a General Partner or Affiliate of a General Partner providing services to or in connection with the Partnership or the Apartment Complex.

(FV_DE171-3_LimitedPartners00000206-07, §12.7(A)-(B))

21

MG Affordable must provide notice, after which CCH XXXI has 30 days to cure, and up to 90 days for non-monetary breaches if the cure is commenced within the initial period.  (*Id.* LimitedPartners0000207, §12.7(C))

**D.    The Historical Course of Conduct.**

*1.    The Limited Partners Received Their Tax Benefits.*

The Limited Partners were allocated all Credits and taxable losses throughout the Compliance Periods, as expected.  (FV_DE221_111:15-112:2; *see also id.* 125:14-126:2, 127:11-25, testifying as to FV_DE169-1 and FV_DE169-2; FV_DE222_367:23-368:6; FV_DE223_493:14-23)  The Compliance Period for Fountainview ended on December 31, 2021; it ended for Park Terrace on December 31, 2022.  (FV_DE221_93:23-94:3; FV_DE171-71_PageID6050; FV_DE171-72_PageID6082)  Accordingly, the Options have ripened and the Credits are beyond risk of IRS recapture (26 U.S.C. §42(j)(i)).

Through 2019, the Fountainview LPs received: (1) $10,978,902 in Credits; (2) $4,426,576 of losses, which, using the top corporate rate for each year (35% for 2006-2017, and 21% for 2018-19), results in $1,462,795 in tax savings in addition to the dollar-for-dollar benefit the Credits provide; and (3) $120,439 in cash flow distributions.  (FV_DE169-1 (summarizing content from FV_DE171-77 through FV_DE171-86, FV_DE171-10, FV_DE171-16, FV_DE171-30, FV_DE171-68, FV_DE171-47))  Because AMTAX contributed a total of $10,564,517 to the

Fountainview Partnership, it received $12,562,136 in benefits thereby producing an 18.9% return on its tax-credit investment. (*Id.*)

Through 2019, the Park Terrace LPs received: (1) $19,106,178 in Credits; (2) $5,960,666 of losses, resulting in $1,997,523 in additional tax savings; and (3) $232,275 in cash flow distributions. (FV_DE169-2 (summarizing content from FV-DE171-87 through 171-94, FV-DE171-11, FV-DE171-17, FV-DE171-31, FV-DE171-69, FV-DE171-47)) Because MG GTC contributed a total of $18,664,185 to the Park Terrace Partnership, it received $21,335,976 in benefits thereby producing a 14.3% return on its tax-credit investment. (*Id.*)

### 2.    *The Historic Cash Advances and Annual Accruals.*

The Properties are part of a portfolio of affordable housing developments affiliated with Mr. Barot, whereby CCH Inc. handles oversight, Impro manages the properties, and an outsourced accounting firm provides accounting services. (FV_DE221_46:7-47:16, 122:4-124:5; FV_DE222_249:8-18, 250:5-12, 344:21-345:15, 355:8-21) Cash has historically been transferred between the various portfolio properties, including from the Partnerships. (FV_DE221_135:17-137:18; FV_DE223_638:9-18) The Partnerships' advances to the General Partners' affiliates (the "Advances") were always disclosed to the Limited Partners as "Due from affiliate(s)" on the Partnerships' annual audited financial statements. (FV_DE222_376:13-378:16;    *e.g.,*    FV_DE171-79_LimitedParnter0005374;

FV_DE171-90_PageID6366)    Mr. Barot acknowledged that these disclosed transfers technically breached the LPAs.  (FV_DE221_135:17-137:18; 141:17-142:20)

The audited financials also disclosed the fees allocated to Appellants each year.  (FV_DE222_376:13-378:16; *e.g.*, FV_DE171-83_LimitedPartners0016582, 16588 (Partnership Management Fee and Incentive Management Fee); FV_DE171-91_LimitedPartners0004514, 4520 (Incentive Management Fee))  The Advances were effectively premature distributions to Appellants.  (FV_DE221_135:17-137:18, 141:17-142:20; *e.g.*, FV_DE171-83_LimitedPartners16588 ("The advances are non-interest bearing and are to be repaid from future cash flow"))  Mr. Barot acknowledged this violated the LPAs, whereby cash should have first been distributed to the General Partners and then transferred to its affiliates.  (FV_DE221_135:17-137:18, 141:17-142:20)  Notwithstanding, the Partnerships' operating expenses were always paid and, as Hunt's CFO (Dan Kagey) testified, the Partnerships' reserve accounts established to cover cash shortfalls from unforeseen events were sufficient.  (FV_DE223_610:24-611:21)  Further, the Properties were required to be insured under the LPAs and no evidence was presented that the insurance was ever inadequate.  (FV_DE171-1_LimitedPartners0000028, §4.1(m); *id.*_LimitedParnters0000104-08,        Exhibit        C;        FV_DE171-3_LimitedPartners0000183-84, §6.8B; *id.*_LimitedPartners0000252-57, Exhibit K)

The audited financials further disclosed the accrual of (i) annual asset management fees the Fountainview Partnership owed Protech, and (ii) cumulative priority distributions the Park Terrace Partnership owed MG GTC. (FV_DE222_376:13-378:16; *e.g.*, FV_DE171-79_LimitedPartners0005375; FV_DE171-91_LimitedParnters0004520; FV_DE171-94_LimitedPartners0011222; *see also* FV_DE171-1_LimitedPartners0000089, §13.4(k) ($6,500 annual Asset Management Fee); FV_DE171-3_LimitedPartners0000145 ($7,500 annual Priority Distribution)).[19] Mr. Barot testified that while the disclosed amounts should have been paid annually if there was cash available for distribution, rather than accrued, the accrued amounts would nonetheless be paid at the end of the Compliance Period from sale or refinancing proceeds, or upon consummation of the Options. (FV_DE221_135:17-137:18, 141:8-143:23, 144:5-147:15)

Importantly, *because the Limited Partners received draft audited financials and approved them before they became final*, the Limited Partners were fully aware of this annual course of conduct. (FV_DE171-25_LimitedPartners0006876; FV_DE221_138:9-139:18, 146:12-147:15; FV_DE222_369:24-371:25) And, the Limited Partners' asset manager (before and after Hunt's involvement began)—Rick

---

[19] *See also* FV_DE171-1_LimitedPartners0000074-75, §11.1(a); FV_DE171-3_LimitedPartners0000194-95, §9.1 (cash flow waterfalls).

Fussell—testified this annual course of conduct began at the Partnerships' inception and the Limited Partners allowed it to continue; until Hunt became involved and worked to capitalize on it to deprive Appellants of their economic rights that had been appreciating in the Properties for many years prior. (FV_DE222_365:2-366:9; 376:19-378:16)

3.    *The Naimisha Construction Notes.*

In 2016, because the Advances reached an auditing threshold, the Partnerships' third-party accountants at Baker Tilly US LLP ("Baker Tilly") told Appellants that "there will need to be a note agreement ***put in place*** in order for the balance to remain a receivable" on the 2016 audited financial statements. (FV_DE171-12_CCH010274 (identifying terms to be included in the note)) The 2016 audited financials nonetheless retained "Due from affiliate" balances as an asset on the Partnerships' balance sheets. (FV_DE171-10_LimitedPartners0012681; FV_DE171-11_LimitedParnters0011232) In 2018, however, without a note, Baker Tilly was going to classify the balance of Advances in 2017 as contra-equity, which would reduce Appellants' capital account balances. (FV_DE171-24_CCH010045; FV_DE221_152:24-153:15) Upon receipt of the 2017 draft audited financials, which occurs annually, the Limited Partners objected to the presentation and demanded the Advances continue to be characterized as assets consistent with previous years. (FV_DE171-25)

Accordingly, Note Agreements (the "Notes") with Naimisha Construction ("Naimisha")[20] were "put in place" for the Advances, which included defined interest rates, repayment schedules, and maturity dates; thereby allowing the Advances to remain, *as the Limited Partners instructed*, as assets on the 2017 balance sheets as a "Note receivable, affiliate." (*See* FV_DE171-12; FV_DE170-4; FV_DE170-5; FV_DE171-16_IMPRO_FV-016999, 17010; FV_DE171-17_LimitedParnters0007125, 7136; FV_DE221_152:1-23) The Notes were subsequently paid off. (FV_DE171-68_CCH_Fountainview-000325, 335; FV_DE171-31_CCH_PARK_TERRACE-000591, 602) For instance, in 2018, the Note for the Park Terrace Partnership was fully repaid, which occurred before Hunt took control and immediately sought to remove the General Partners for this. (FV_DE171-31_CCH_PARK_TERRACE-000591, 602) The Notes were never intended to mislead or defraud anyone; rather, the Notes were required by Baker Tilly to keep Advances as balance sheet assets, which the Limited Partners directed. (FV_DE221_152:1-153:15; FV_DE171-24_CCH010045; FV_DE171-25; *see also* FV_DE171-12_CCH010274)

---

[20] Naimisha Construction is owned by Mr. Barot and his wife, Naimisha Barot. (FV_DE221_148:21-149:10)

**E.    Hunt's Removal Efforts.**

*1.    Hunt Acquires Control and Immediately Pursues Removal.*

Around October 2018, after the ILPs had received all of their Credits,[21] Hunt acquired Morrison Grove Management, who had been the ILPs' asset manager. (FV_DE223_514:13-515:4; FV_DE222_365:17-24)  Hunt had no prior interest in the Limited Partners or the Partnerships.  (*Id.*)  Thereafter, Hunt acquired the tax-credit investor interests in the investment funds that own the ILPs, thus obtaining complete ownership of the ILPs in addition to the management rights over them. (FV_DE223_514:13-515:4)

Hunt acquired the tax-credit investor interests in MG GTC, along with additional limited partner interests in eight or nine other LIHTC partnerships, for approximately $10,000.  (FV_DE223_515:8-517:21)[22]

By January 1, 2019, Hunt (specifically Mr. Kagey) had complete control of Appellees, thus Mr. Kagey immediately went to work to remove Appellants for the

---

[21]    (*See*    FV_DE171-10_LimitedParnters0012692    (Note    8);    FV_DE171-17_LimitedPartners0007136 (Note 8); FV_DE221_64:12-20; FV_DE223_493:14-23)

[22] Mr. Kagey has provided similar testimony in the *CED Waterford* case, confirming Hunt's business model that has given rise to the various concerns expressed and public policy issues presented by this Aggregator business model.  *CED Waterford*, 2023 WL 3436906, at *4, 12; *see also* WSHFC Report at 1-6; *St. Mary's*, 2023 WL 2698061, at *2 ("the public's particular interest in the issues at the heart of this lawsuit has been well-documented" (collecting authorities)).

historical course of conduct, similar to efforts in two other Florida LIHTC partnerships. (FV_DE223_502:10-503:2; 534:17-535:4; 535:23-536:1); *CED Berkshire*, 2020 WL 6537072, at *4-5 (finding Hunt's breach of contract accusations raised against a LIHTC general partner to be "baseless and intended to deprive [the general partner] of its [p]urchase [o]ption"); *CED Berkshire*, No. 2018-CA-13886-O, 2023 WL 3093351, at *1-3 (Fla. Cir. Ct. Apr. 24, 2023) (permitting LIHTC general partner to pursue collection efforts in supplementary proceedings against Hunt and Mr. Kagey); *CED Waterford*, 2022 WL 1717946, at *7-8 (discussing Hunt's "bad faith effort[s] to deprive [LIHTC general partner] of its contractual option rights"); *CED Waterford*, 2023 WL 3436906, at *10 (same). Indeed, Mr. Kagey admitted that *if Appellants are removed then Hunt gets all of the equity* Appellants are otherwise entitled to receive under the LPAs, including through their Options, *despite making no contribution to either Partnership or Property*. (FV_DE223_501:7-502:3)

On May 3, 2019, Hunt (through Appellees) sent Appellants Notices of Default (the "Notices"), which sought to remove Appellants for: (1) Protech's accrued asset management fees and MG GTC's accrued priority distributions; (2) the Advances; and (3) delayed delivery of the 2018 financial reports. (FV_DE171-42, FV_DE171-43)[23] The Notices represent the first time Appellees provided any sort of default

---

[23] Appellees admitted at trial they received all required financial reporting.

notice or threatened to remove Appellants in connection with the parties' historical practices, but for which Hunt immediately used as a basis for removal once in control. (FV_DE222_373:1-14, 376:13-378:16)  To be sure, Hunt did not pursue any sort of collaborative effort to change these historical practices, rather it weaponized them, launched the Notices, and refused to cooperate with efforts to cure them during the cure period.

> 2.  *Appellants Cure the Breaches While Appellees Seek to Prevent the Cures.*

CCH XXX's 90-day cure period meant it had until August 1, 2019 to cure. (FV_DE171-1_LimitedPartners0000067, §8.15(b))  CCH XXXI had 30 days to cure, plus an additional 1-5 days for delivery time, *i.e.*, until June 3rd or June 7th, and an additional 60 days to cure non-monetary breaches, thus until August 2, 2019, and  August  6,  2019.  (FV_DE171-3_LimitedPartners0000207,  §12.7C; *id.*_LimitedPartners0000217, §15.4)

Upon learning of the Notices, Mr. Barot directed Ashok Kumar, CCH Inc.'s Chief Operating Officer (Day1_Tr._46:7-15), to work with Baker Tilly to resolve the issues. (FV_DE221_130:20-133:12)  Rather than limit the cure to the Notices, Mr. Barot instructed Mr. Kumar to go back to the Partnerships' inceptions and cure any amounts Appellees may have been owed under the LPAs, assuming the

---

(FV_DE222_379:6-25)

Advances never occurred.  (FV_DE221_201:22-202:10, 202:17-203:9, 204:10-20, 205:4-19)  It appears Mr. Kumar began working with Baker Tilly around May 15, 2019, but in no event later than May 28, 2019.  (FV_DE171-48_CCH011606) Accordingly, Baker Tilly analyzed the Partnerships' historic financials and calculated what Appellees would have received (i) from annual cash flow distributions had no Advances been made, and (ii) in fees and priority distributions if paid annually rather than being accrued.  (FV_148-1_114:3-117:6, 117:23-118:3 (testifying about Defs' Ex. 39)[24]; FV_148-1_120:25-122:21 (testifying about Defs' Ex. 41)[25])  Based on Baker Tilly's analysis, Appellants understood that the Fountainview LPs would have received an aggregate of $105,994, and the Park Terrace LPs would have received $141,235.[26]  (FV_DE221_172:25-173:7, 174:5-175:16 (testifying as to FV_DE169-1 and FV_DE169-2), 202:6-10, 204:10-20; FV_DE171-47;  FV_DE148-1_125:18-126:12;  *see also*  FV_DE148-1_128:19-129:12)  Mr. Fussell admitted during trial that Baker Tilly's determination of what

---

[24] Defendants' Exhibit 39 was admitted at trial (FV_DE223_617:14-15; FV_DE170) and submitted to the Court by Appellees via flash drive.  A PDF copy of Defendants' Exhibit 39, as produced by Appellees to Appellants prior to trial, is included in the Appendix at FV_DE170, Defs' Ex. 39.

[25] Defendants' Exhibit 41 was admitted at trial (FV_DE223_617:14-15; FV_DE170) and submitted to the Court by Appellees via flash drive.  A PDF copy of Defendants' Exhibit 41, as produced by Appellees to Appellants prior to trial, is included in the Appendix at FV_DE170, Defs' Ex. 41.

[26] As discussed below, Appellants later issued checks to Appellees in these amounts, which Appellees accepted and endorsed.

31

the Limited Partners were owed would be an adequate cure.  (FV_DE222_397:2-8, 406:25-409:5)

On May 29, 2019, while Baker Tilly was working on its calculations, Appellants' counsel contacted Appellees' counsel—Steve Griffith, who is one of Hunt's litigators Mr. Kagey works closely with to deploy removal efforts in bad faith.   (FV_DE171-45); *see also CED Waterford*, 2022 WL 1717946, at *6 (discussing Mr. Griffith), *7-8; *CED Berkshire*, 2020 WL 6537072, at *4-5; *CED Waterford*, 2023 WL 3436906, at *2-3 (barring witness testimony and discussing violations of court ruling and procedures).  A conversation between counsel occurred before June 3, 2019, wherein Appellants were "led to believe that [Appellees] sought to resolve this dispute in good faith" and after which an email was sent, on June 3, 2019, to Mr. Griffith confirming that Appellants intended "to correct any underpayment and to bring unpaid [Asset Management Fees] current through the end of 2018."  (FV_DE171-55; FV_DE171-49)  Despite several follow-up calls to Mr. Griffith, Appellants received no response until Mr. Griffith sent Notices of Removal on June 18, 2019 (the "Removal Notices"), which surprised Appellants.[27] (FV_DE171-51; FV_DE171-53; *see also* FV_DE171-55).

---

[27] For instance, the Removal Notices were sent halfway into the FV LPA's 90-day cure period.

Appellants continued their curative efforts despite this lack of good faith or cooperation, whereby their counsel spoke with Mr. Griffith on June 18, 2019, advising him that Appellants "seek to cure the defaults." (FV_DE171-54) Appellants' counsel followed up with an email on June 19, 2019, requesting wire instructions to send the cure amounts calculated by Baker Tilly. (*Id.*) Mr. Griffith responded on June 19 and stated, in conclusory fashion, that the cure was not sufficient, raising pretextual "concerns" with: (i) how the transaction would be booked; (ii) the Partnerships' tax returns not being filed before the audited financials were final; and (iii) whether the cure checks were for the full amounts owed, despite never identifying the amounts. (*Id.*) Appellants' counsel immediately followed up to (i) ask how Appellees wanted the transaction booked; (ii) inform Mr. Griffith that Appellants would proceed with the tax returns notwithstanding the status of the audited financials; and (iii) request Mr. Griffith identify the amounts allegedly owed:

> IF YOUR CLIENT'S # S ARE DIFFERENT, PLEASE LET US KNOW WHAT'S CLAIMED WITH A BRIEF EXPLANATION – PERHAPS THERE'S NO DISAGREEMENT

(*Id.*) (emphasis in original)

Thereafter, on June 20, 2019, another attorney for Appellants sent Mr. Griffith a letter to address the lack of good faith and cooperation with Appellants' cure efforts, reiterating Appellants' request for Appellees to identify what else was sought. (FV_DE171-55) When Mr. Griffith responded, he once again did *not*

provide information about what more was required for Appellants to satisfy Appellees beyond the cure amounts calculated by Baker Tilly. (FV_DE171-57) Thus, on June 21, 2019, and because wire instructions had not been provided, curative checks in the amounts calculated by Baker Tilly were sent from the Partnerships to the Limited Partners (the "Checks"). (FV_DE171-47) *CCH Inc. provided the Partnerships with the funds to support the Checks*. (FV_DE171-62 (bank statement reflecting deposits/credits to the Fountainview Partnerships' bank account from an account ending in -3557); FV_DE171-63 (same for Park Terrace Partnership); FV_DE221_177:11-179:25; FV_DE222_335:22-337:3, 343:7-344:1, 344:16-20) Appellees received and deposited the Checks, and have kept the funds. (FV_DE222_350:10-25; FV_DE120-2_PageID2016, ¶24; PT_DE108-2_PageID1913, ¶24)

Also on June 21, 2019, Appellants' counsel spoke with Mr. Griffith and again asked what else Appellees wanted for the cure. (FV_DE171-60) Appellants' counsel followed up on June 24 and 26, 2019. (FV_DE171-60) On June 28, 2019, Mr. Griffith responded by stating the Checks were insufficient but did *not* explain why. (FV_DE171-61) Concurrently, Hunt deployed unannounced representatives to the Properties to physically take over control of them (FV_DE171-57; FV_DE171-58) and, after being unsuccessful, threatened more attempts to take over control by force. (FV_DE223_721:13-722:11)

Further context for this obstructive, rather than cooperative, conduct was provided at trial, when: (1) Mr. Kagey admitted that Hunt had *not* performed any analysis concerning what amounts were needed to cure and whether the Checks were sufficient cures (FV_DE223_519:6-9); and (2) Mr. Fussell explained, ***for the first time***, that under his analysis, on which the Notices were based, (a) the Fountainview LPs were owed $85,695, and (b) the Park Terrace LPs were owed $106,999, (both significantly *less than* the Checks) (FV_DE222_389:8-394:6 (testifying about FV_DE171-36), 397:19-399:24 (testifying about FV_DE171-37); *see also id._*379:3-389:4, 394:15-396:13, 397:6-8).[28]

On July 5, 2019, Appellants' counsel again reached out to Appellees' counsel regarding what more was wanted, but Hunt had already raided the Properties once and indicated they would try again; thus, the Matters were commenced. (FV_DE171-64; FV_DE223_721:13-722:11)

## II.    COURSE OF PROCEEDINGS AND DISPOSITION BELOW

### A.    Pleadings and Summary Judgment.

The Complaints sought, *inter alia*, (i) a declaratory judgment that Appellants had not been removed, and (ii) a finding that Appellees breached the LPAs and were

---

[28] During examination, Mr. Fussell could not identify what more was needed to cure, referring generally to "liquidated damages," which he admitted were not included in the Notices (FV_DE222_397:12-18, 401:1-402:5), nor were they identified in the Final Pretrial Statements (FV_DE223_520:3-521:21 (discussing FV_DE171-16)); FV_DE140_PageID4379; PT_DE130_PageID4363; FV_DE173_22, ¶59).

enjoined from continuing their removal attempts. (FV_DE1-2_PageID17-22; PT_DE1-2_PageID18-22)  On August 2, 2019, Appellees removed the Matters to the District Court and, on August 30, 2019, Appellants moved to remand. (FV_DE1; PT_DE1; FV_DE5; PT_DE5)  On September 23, 2019, the District Court denied the remand motions. (FV_DE15; PT_DE15)

On December 4, 2019, Appellees filed answers and counterclaims. (FV_DE18; PT_DE18)  The counterclaims (i) alleged Appellants breached the LPAs, did not cure the defaults, and breached their fiduciary duties, and (ii) sought a declaratory judgment that Appellants were removed and Impro, who was brought into the litigation as a counter-defendant only, was terminated as the Partnerships' management agent as a result. (FV_DE18_PageID383-88; PT_DE18_PageID427-32)  After discovery closed and Appellees filed summary judgment motions, the District Court issued an Order on November 8, 2021, which denied summary judgment, confirmed that Appellants had admitted breaching the LPAs through the course of dealing, and determined fact issues remained concerning "the materiality of the breaches, the General Partners' intent, and whether removing the General Partner would give rise to an inequitable forfeiture." (FV_DE143_PageID4509; PT_DE133_PageID4492).

**B.      Trial, Judgment, and Motion to Alter or Amend Judgment.**

A three-day bench trial was held in December, 2021.  On April 5, 2022, the District Court issued Findings of Fact and Conclusions of Law in both Matters (the "Order").  (FV_DE173)   The District Court concluded Appellants "committed material breaches of the [LPAs] and violations of their legal duties, and failed to timely cure these breaches and violations when given the opportunity to do so," and thus Appellees were entitled to declaratory relief removing Appellants from the Partnerships.  (*Id.*_PageID6440)   On April 6, 2022, the District Court entered Judgments dismissing Appellants' claims with prejudice and entering a declaratory judgment, in Appellees' favor, that (i) Appellants were removed as of the Judgment date, and (ii) Impro was terminated as the Partnerships' management agent effective 30 days later.  (FV_DE174; PT_DE162)

On May 3, 2022, Appellants moved to amend or alter the Judgment based upon errors of fact and law, including: (i) not finding the breaches were immaterial and otherwise cured; (ii) not applying the doctrines of waiver and estoppel; and (iii) not preventing the manifest injustice caused by the extreme forfeiture of Appellants' nearly $9 million of economic rights under the LPAs and Options. (FV_DE178)

On December 19, 2022, Appellants' motion to alter or amend the Judgment was denied. (FV_DE216) The Notices of Appeals were timely filed on January 18, 2023. (FV_DE217; PT_DE205)

## III.    STANDARDS OF REVIEW

The issues here involve mixed questions of law and fact; thus, the standard of review "depend[s] on whether answering it entails primarily factual or legal work." *S. Bank Nat. Ass'n ex rel. CW Capital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018) ("*Village at Lakeridge*"). Legal issues are treated "without the slightest deference," *i.e.*, *de novo*. *Id.* at 968. Factual issues are reviewed for clear errors. *Reiterman v. Abid*, 26 F.4th 1226, 1234-35 (11th Cir. 2022). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Jenkins v. Comm'r, Ala. Dep't of Corr.*, 963 F.3d 1248, 1264 (11th Cir. 2020) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

***First***, whether the Checks cured the breaches involves fact issues reviewed for clear errors.

***Second***, "where the facts are admitted, [materiality] may well be a question of law." *Ramos v. Nw. Mut. Ins. Co.*, 336 So. 2d 71, 75 (Fla. 1976) (affirming failure to cooperate was a material breach; noting materiality concerns prejudice); *see also*

38

*Ferndale Labs., Inc. v. Schwarz Pharma, Inc.*, 123 F.App'x. 641, 648 (6th Cir. 2005) (*de novo* review); *Frank Felix Associates, Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (same); *Morrison v. Mahaska Bottling Co.*, 39 F.3d 839, 844 (8th Cir. 1994) (same).  It is otherwise a fact issue reviewed for clear errors.

**Third**, the District Court's equitable determination that removing the General Partners does not cause an extreme forfeiture or a manifest injustice is reviewed for abuse of discretion.  *See Preferred Sites, LLC v. Troup Cnty.*, 296 F.3d 1210, 1220 (11th Cir. 2002); *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 562 (2014).  "An abuse of discretion occurs when a district court commits a clear error of judgment, fails to follow the proper legal standard or process for making a determination, or relies on clearly erroneous findings of fact." *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 846 F.3d 1159, 1163 (11th Cir. 2017).

**Fourth**, abuse of discretion likewise applies to the District Court's conclusions involving (i) the Hunt-controlled Appellees' failure to cooperate in Appellants' curative efforts, including their refusal to acknowledge the corrective checks were sufficient until Mr. Fussell testified at trial that they were (FV_DE222_ 399:4-24); and (ii) the application of waiver and estoppel given Appellees' historic practice of treating the breaches as immaterial (until Hunt took control and immediately declared otherwise without any cooperation in the curative efforts) (FV_DE222_373:1-7, 376:13-377:1, 376:13-378:19, 417:1-17).

## SUMMARY OF THE ARGUMENT

The District Court erred by entering Judgments declaring Appellants removed from the Partnerships, which resulted in Impro being terminated as the Partnerships' management agents, for four critical reasons:

*First*, clear error occurred in finding the breaches were not fully cured despite Appellees' obstructive efforts. Appellees admitted at trial the Checks exceeded the amounts identified in the Notices, and that having Baker Tilly calculate the cure amounts (as occurred) would be sufficient to cure. Further, CCH Inc. funded the Checks; CCH XXX did not use any loans. CCH XXXI also stopped Advances from continuing, ending the nearly 15-year practice, and otherwise fully cured the breaches identified in the Notices. Additionally, the cures were timely, particularly considering the Hunt-controlled Appellees violated their duties of good faith to cooperate with Appellants' curative efforts (and actively frustrated them) because Hunt never wanted a cure.

*Second*, clear error occurred when the breaches were found material. Appellees' essential, bargained-for benefits were the Credits and taxable losses, not their entitlement to any material cash benefits or residual equity amounts in the Properties as they now have because of removal. Available material cash and residual equity amounts was instead material to Appellants, as owners of the general

partner interests.  The breaches also had no detrimental impact on the Partnerships or Properties and were thus not material for this reason as well.

*Third*, the District Court abused its discretion by allowing an extreme forfeiture to occur.  Appellees had never issued a default notice or threatened removal until immediately after Hunt acquired control and management over them, although they were aware of the breaches since their admission to the Partnerships.  Appellees were also not substantially prejudiced given they received their essential, bargained-for benefits.  But upon removal, Appellants have forfeited nearly $9 million in benefits in connection with breaches that, over a 15-year period, collectively (i) produced, at best, *less than* $250,000 of harm to cure, and (ii) conferred a windfall upon Hunt, who contributed ***nothing*** to the Partnerships.  This is manifestly unjust and a violation of established equitable principles under Florida law.

*Fourth*, the District Court abused its discretion in not applying the doctrines of waiver or estoppel to prevent removal.  For over a decade, Appellees did not consider Appellants' breaches material and thus led Appellants to believe they would not be placed in default or removed for the accepted course of conduct.  Appellees should not have been allowed, under the circumstances presented here, to do so once under Hunt's ownership and control.

Accordingly, these findings should be vacated and the conclusions reversed, and the Judgments declaring Appellants removed, and Impro terminated, should also be reversed with instructions to the District Court to reinstate Appellants as General Partners.

## **ARGUMENT**

## I.    **THE DISTRICT COURT ERRED BY CONCLUDING THE BREACHES WERE NOT CURED**

### A.    **The Breaches Were Cured.**

As described in Facts_Section E.2, *supra*, the identified breaches were fully cured.  Mr. Fussell's trial testimony proves the Checks were more than sufficient, contrary to what Appellees' counsel continuously represented to Appellants during the cure period.  (*Id.*; *see also* FV_DE222_389:8-394:6 (Mr. Fussell testifying about FV_DE171-36), 397:19-399:24 (Mr. Fussell testifying about FV_DE171-37))  The evidence further proves that the Checks were funded by wires received from CCH Inc. and, contrary to Appellees' contentions, the Partnerships are not obligated to pay this back.  (FV_DE171-62 (bank statement reflecting deposits/credits to the Fountainview Partnerships' bank account from an account ending in -3557); FV_DE171-63 (same for Park Terrace Partnership); FV_DE221_177:11-179:25; FV_DE222_335:22-337:3, 343:7-344:1, 344:16-20)  Notwithstanding internal CCH Inc. communications discussing how to potentially characterize the money injected to cure the breaches, ***no loans were ever made***.  (*Id.*; *see also* FV_DE221_190:19-

42

191:6; FV_DE222_302:13-303:12; FV_DE171-68_CCH_Fountainview-000334-35 (Related Party Transactions); FV_DE171-69_CCH_Park_Terrace (same))

At trial, Appellees sought to undermine the Checks by arguing the historic Advances from 2017 and 2018 needed to be returned to the Partnerships, from which Appellees would immediately receive what they were owed, with the residual amount remaining in the Partnerships to be distributed the following year. (FV_DE223_403:4-25; FV_DE222_391:18-392:14)    But any residual amount rightfully *belonged to the General Partners* given their entitlement to approximately 90% of available, annual cash flow.  (FV_DE171-1_LimitedPartners0000074-75, §11.1(a);  FV_DE171-3_LimitedPartners0000194-95, §9.1)    By requiring the residual amounts be distributed in the following year, Appellees were demanding 10% of Appellants' share.  But such is not required under the LPAs, nor did the Notices demand it, and thus it is not required to cure the breaches because the Notices were obligated to first identify them and did not.  (FV_DE171-1_LimitedPartners0000074-75, §11.1(a);  *id.*_LimitedPartners0000067, §8.15(b); FV_DE171-3_LimitedPartners0000194-95,  §9.1;  *id.*_LimitedPartners0000207, §12.7C;  FV_DE171-42;  FV_DE171-43)    Accordingly, returning cash to immediately distribute it back to Appellants is superfluous, it was not needed for a cure.  Rather, determining what Appellees would have received from prior year

43

distributions absent the historic conduct, and paying them that amount, was the proper cure.

The District Court nonetheless concluded that the breaches were not cured, relying upon clearly erroneous factual findings, requiring reversal.

> *1.    Fountainview.*

The District Court found that CCH XXX failed to cure because "Baker Tilly's records relating to their audit for 2019 show a loan of $54,000 to the Fountainview partnership from Impro and reflect a statement by [Ashok] Kumar that the purpose of the Impro loan was to cover outstanding distributions to the Limited Partners." (FV_DE173_PageID6455, ¶45)    This finding constitutes a clear error for two reasons.

*First*, the referenced $54,500 loan was 61-90 days old as of December 31, 2019, meaning (even if it exists) it accrued ***in October 2019***, not June 2019 when the Checks were issued.  (FV_DE171-70; FV_DE221_186:16-189:25 (testifying about FV_DE171-70))

*Second*, the only "evidence" presented at trial that a loan was made is a note in Baker Tilly's working papers.  (FV_DE171-70)  Indeed, there is no testimony about what this note means and Mr. Kumar unfortunately passed away due to complications from Covid-19 during discovery, thus he could not testify about it. (FV_DE221_46:11-17,    192:14-25;    FV_DE222_320:21-325:7;    FV_DE90;

FV_DE148-1_96:5-100:3 (testifying about FV_DE171-70)) Further, the Fountainview Partnership's 2019 audited financials prepared by Baker Tilly do not identify any outstanding loans or note receivable from Impro. (FV_DE171-68; FV_DE221_319:6-16) Accordingly, this "evidence" is hearsay upon hearsay and is inadmissible to prove the truth of the matter asserted. Fed. R. Evid. 801, 802.

In sum, CCH XXX had until August 1, 2019, to cure the breaches identified in the Notice it received and provided the Checks in June 2019; thus, the breaches were fully and timely cured, despite being immaterial.

### 2.    *Park Terrace.*

The District Court found that CCH XXXI failed to cure because "improper cash advances to affiliates continued in 2019 even after the May 3, 2019, notice of default, and these withdrawals were not paid back until November 2019." (FV_DE173_PageID6456, ¶47) This is also a clear error.

The Notice involves amounts owed to the Park Terrace LPs in 2017 and 2018 only. (FV_DE222_384:7-10, 397:19-398:6 (testifying about FV_171-37); FV_171-43_LimitedPartners0000320-21, §I-II) While CCH XXXI and Baker Tilly were working to calculate the curative amount (which ultimately exceeded what Hunt was demanding), the Park Terrace Partnership's outsourced accounting firm continued advancing funds consistent with the historic course of conduct dating back over a decade, and thus it took time to ensure this practice ended, which definitively

45

occurred as of July 1, 2019.    (FV_DE170-10_ CCH012136; *see also* FV_DE221_136:2-25; *see also* FV_DE223_504:16-505:25)

In November 2019, while cleaning up the Park Terrace Partnership's book entries due to the Checks, the additional due from affiliate balances from the first six months of 2019 were identified.    (FV_DE171-66; *see also* FV_DE170-10_CCH012136)  Mr. Kumar caused these Advances to be returned to the Park Terrace Partnership, and the due from affiliate balances were zeroed out before they became "new breaches" in 2020, when the 2019 cash flow would be calculated and distributed.  (*Id.*; *see also* FV_DE222_330:16-332:10)  Thus, no Advances existed as of December 31, 2019.  (FV_DE171-69_CCH_Park_Terrace-000557)

Accordingly, the District Court's conclusion that Appellants failed to fully or timely cure should be reversed.

### B.    Hunt Never Desired or Cooperated with the Cure.

Critically, a nonbreaching party's refusal to cooperate with another's performance of a contractual cure right weighs against strict compliance with timing or other contractual requirements, especially where relief would not threaten the nonbreaching party's essential, bargained-for benefits.  *See Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 409-410 (Fla. 1974).[29]  In

---

[29]  Florida's substantive law applies under the LPAs.  (FV_DE171-1_LimitedPartners0000091, §16.2; *id._*LimitedPartners0000022; FV_DE171-3_LimitedPartners0000217, §15.1; *id._*LimitedPartners0000148)

*Blackhawk Heating*, the Florida Supreme Court relied on equitable principles to excuse an option-holder from a contractual payment-upon-exercise requirement, in part, because the nonbreaching party "was making performance impossible." *Id.* at 409-410 ("[w]hen a party stipulates that another shall do a certain thing, he thereby impliedly promises that he will himself do nothing which will hinder or obstruct that other in doing that thing" (cleaned up)).  The court further reasoned that the nonbreaching party (here Appellees) should *not* be permitted to receive the substantial benefit for which it bargained, "and at the same time bar [the breaching party] from their rights under the contract." *Id.* at 406, 410; *see also Worth v. Stuff-Palm*, 949 So. 2d 1199, 1201-02 (Fla. 4th DCA 2007) (affirming that optionor breach his implied duty of good faith by refusing to produce information so optionee could evaluate whether to exercise option); *Paul v. Hurley*, 315 So. 2d 536, 538 (Fla. 4th DCA 1975) (enforcing assignment agreement against limited partner despite general partner's failure to repay capital because limited partner advantageously prevented repayment); *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097-98 (Fla. 1st DCA 1999) ("where the terms of the contract afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party").

But this is precisely what occurred here. Appellants received their essential, bargained-for tax benefits before Hunt appeared, including all available Credits and taxable losses (Facts_Section D.1, *supra*), and while Appellants' entitlement to 10% of cash flow (if any) is ultimately immaterial, the Checks fully cured the cash flow-related breaches using Baker Tilly's analysis. (Facts_Section E.2, *supra*) Yet, the Hunt-controlled Appellees nonetheless refused to accept the cures and would not identify what else was needed, in their view, to cure the breaches. Moreover, Appellees rebuffed and ignored Appellants' repeated requests to explain what more they wanted. (*Id.*) Plainly, Appellees refused to cooperate and ultimately cashed the Checks, ***keeping the curative funds to this date*** and remaining silent about what more they wanted. (*Id.*) Further, Appellees ***never even analyzed*** whether the Checks cured the Notices. (*Id.*; FV_DE223_519:6-9; FV_DE148-6_106:14-110-5, 117:15-24; FV_DE222_389:8-394:6, 397:19-399:24) Hunt was plainly intent on removal; it was the endgame from the beginning and is consistent with Hunt's Aggregator's playbook. (*See* Facts_Section A.2, *supra*)

Accordingly, (i) the District Court committed a clear error and abused its discretion when concluding Appellants did not timely cure the breaches, and (ii) removal should not be endorsed but, instead, should be vacated due to Appellees' refusal to cooperate with the curative efforts during the cure period. (*See also* Argument_Section III, *infra*).

## II.    THE DISTRICT COURT ERRED IN CONCLUDING THE BREACHES WERE MATERIAL

As the District Court correctly recognized, the following law on materiality applies:  (i) "it is an established principle of contract law that an injured party may terminate a contract for breach *only if* the breach is material"; (ii) "the general inquiry is whether the injured party has received substantially what he bargained for"; *and* (iii) the relevant factors include "the extent to which the injured party can be compensated for the benefit of which he was deprived, the extent to which the party failing to perform will suffer forfeiture due to the contract's termination, and the extent to which the behavior of the party failing to perform comports with standards of good faith and fair dealing." (FV_DE143_7 (quoting *Ron Matusalem & Matusa of Fla., Inc. v. Ron Matusalem, Inc.*, 872 F.2d 1547, 1551 (11th Cir. 1989))).  Additionally, "[a] breach is material when it goes to the essence of the parties' agreement, deprives the non-breaching party of ***substantially*** what it bargained for, *and* is of such significance that it relieves the non-breaching party of its duty to perform the contract."  (FV_DE173_28, ¶14 (citing *Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker*, 160 So. 3d 955, 960 (Fla. 5th DCA 2015))).

The District Court, however, misapplied these legal principles to the facts and its materiality conclusion must thus be reversed.

49

**A.      Appellees Received Their Essential, Bargained-for Benefits.**

Consistent with LIHTC partnership structures, Appellees were admitted as passive, *tax-credit investors*, not traditional real estate investors, in the Partnerships and, over a 15-year period, received their essential, bargained-for benefits that produced, respectively, total returns of 18.9% and 14.3%. (*See* FV_DE222_366:10-16; FV_DE169-1; FV_DE169-2; FV_DE171-1_LimitedPartners_0000112; FV_DE171-3_LimitedPartners0000154, §3.5; *see also* Facts_Section A.1 and B, *supra*) Further, these benefits were received ***before*** Hunt took over complete control of the Limited Partners' Partnership interests in 2019. (*See* Facts_Section D.1 and E.1, *supra*)   Appellants' delivery of these essential, bargained-for benefits is undoubtedly why Appellees never took action against Appellants for immaterial amounts or sought to utilize the parties' historical practices relating to them against Appellant before Hunt took over control of Appellees.

Moreover, the amounts at issue are less than 1% of the total benefits Appellees received due to Appellants' efforts.  For instance, the Fountainview LPs received a total benefit of $12,562,136 from the Fountainview Partnership.  (FV_DE_169-1)  The $105,994 curative amount is merely 0.66% of the total benefits already received. (*Id.*)  Likewise, the Park Terrace LPs received total benefits of $21,335,976 from the Park Terrace Partnership.  (FV_DE_169-2)  Thus, the $141,235 curative amount is only 0.53% of the total benefits received.  (*Id.*)  As such, the immateriality of the

Advances and accrual of fees in the collective amount of $247,229, when juxtaposed against $33,898,112 in total benefits already received, *plus* the nearly $9 million windfall that Hunt is now poised to receive based on these breaches, further demonstrates why the breaches are not material.  (*See* Facts_Section C.1 and E.2, *supra*)

### B.    The Breaches Had No Detrimental Impact on the Partnerships, the Properties, or the Limited Partners.

The District Court concluded Appellants' breaches were material because the Advances "constituted a substantial portion of the cash available to the projects in some years."  (FV_173_20, ¶52)  This finding is clearly erroneous.

*First*, the Advances did ***not*** involve "cash available to the projects," rather, as the Notices confirm, they involved only cash available ***for partner distributions***.  (*See* FV_DE171-42, FV_DE171-43; Facts_Section E.1, *supra*)  Cash available to the Properties was ***never*** at issue.  Indeed, the Partnerships' operating expenses were always paid (*e.g.*, FV_DE171-86_LimitedPartners0012575; FV_DE171-68_CCH_Fountainview-000329; FV_DE171-94_LimitedPartners0011217; FV_DE171-69_CCH_Park_Terrace-000562); the reserve accounts established to cover unanticipated operating or replacement expenses were sufficiently funded (FV_DE223_610:24-611:21; FV_DE171-1_LimitedPartners0000065, §8.13; FV_DE171-3_LimitedPartners0000175, §4.11); the Properties were required to be insured against extraordinary events, and were (FV_DE171-

51

1_LimitedPartners0000028, §4.1(m); *id.* LimitedParnters0000104-08, Exhibit C; FV_DE171-3_LimitedPartners0000183-84, §6.8B; *id.* LimitedPartners0000252-57, Exhibit K); and the Partnerships were not in imminent financial risk (FV_DE223_517:22-519:3).[30]

*Second*, Appellants were already entitled to a "substantial portion" of available cash each year, thus the Advances, which were effectively premature distributions to Appellants, were not disproportional. (*See* Facts_Section B and D.2, *supra*)

*Third*, by looking back in time to cash available "in some years," the District Court erred because Appellees were fully aware of the historic Advances, continuously approved audited financials disclosing them, and never took any action against Appellants until 2019 after Hunt took control. Concluding the breaches were material based upon conduct the prior Limited Partners allowed to occur is clear error. (*See also* Argument_Section IV, *infra*)

*Fourth*, Mr. Fussell and Mr. Kagey both admitted at trial that there were no alleged breaches involving Appellees' entitlement to the Credits or taxable losses. (FV_DE222_367:23-268:6; FV_DE223_493:14-23)    And, now that the

---

[30] The District Court also found the Limited Partners failed to present evidence that the Properties declined in value. (FV_DE173_23, ¶60)

Partnerships' Compliance Periods have ended, those Credits have been secured and no recapture risk remains.  (*See* Facts_Section D.1, *supra*)

Accordingly, because (i) Appellants delivered to Appellees their essential, bargained-for benefits, and (ii) Appellants' breaches also had no detrimental impact on the Properties or the Partnerships, the breaches were not material and do not warrant removal.  *See Burlington & Rockenbach, P.A. v. L. Offs. of E. Clay Parker*, 160 So. 3d 955, 960 (Fla. 5th DCA 2015) (a material breach must involve "the essence of the contract" and be "of such significance that it relieves the injured party from further performance of its contractual duties"); *see also Covelli Fam., L.P. v. ABG5, L.L.C.*, 977 So. 2d 749, 752 (Fla. 4th DCA 2008); *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So. 2d 853, 857 (Fla. 4th DCA 1972).

The District Court's conclusion to the contrary requires reversal.

### C.    The Immateriality of the General Partners' Conduct Likewise Requires Reversal of the District Court's Conclusion that the General Partners' Breached their Fiduciary Duties.

The District Court concluded that, due to the Advances, Appellants had diverted the Partnerships' assets to non-partnership uses and breached their fiduciary duties of loyalty.  (FV_173_24-25, ¶¶5-7 (citing, *inter alia, Carolina Preservation Partners, Inc. v. Wolf Arbin Weinhold*, 414 B.R. 754, 761-62 (M.D. Fla. 2009))) But, as described above, the Advances were not intended to "divert partnership assets to non-partnership purposes," rather, they were erroneous, premature cash

distributions to Appellants that were ultimately cured once Hunt caused Appellees to begin complaining about them for removal purposes.

Indeed, Appellants undisputedly managed and operated the Partnerships and the Properties for nearly 15 years, and delivered Appellees their essential, bargained-for benefits, which generated a significant return for the tax-credit investors. As such, the business judgment rule applies to immunize Appellants "for management decisions, which were undertaken within the power and authority of management…and which were made in good faith." *See*, *e.g.*, *Hidden Hills Mgmt.*, 2019 WL 3297251, at \*19 (internal quotations and citations omitted). Although Florida courts have not applied the business judgment rule to facts like those here, the relevant principles are analogous to cases involving corporate boards of directors, who have fiduciary duties like Appellants. *See In re Bal Harbour Club, Inc.*, 316 F.3d 1192, 1195 (11th Cir. 2003). Under the business judgment rule, courts presume that those with operational and managerial control of a business (like Appellants) have acted in good faith in making business decisions and will not question this judgment in the "absence of a showing of abuse of discretion, fraud, bad faith or illegality…." *Id.* (internal quotations and citation omitted).

Here, the Advances were immaterial to Appellees (thus allowing them to occur for over a decade) and did not rise to the level of a breach of the duty of loyalty.

54

For these reasons, as well as those provided in Argument_Section III, *infra*, the District Court's conclusion should be reversed.

## III. THE DISTRICT COURT ERRED WHEN ENTERING JUDGMENTS RESULTING IN EXTREME FORFEITURES

Under Florida law, it is "fundamental…that equity prefers not to enforce the breach of contractual provisions which result in extreme forfeiture." *Torres v. K-Site 500 Assocs.*, 632 So.2d 110, 112 (Fla. 3d DCA 1994) (citation omitted). "Equity abhors forfeiture…." *Id.* (citing cases); *see also White v. Brousseau*, 566 So.2d 832, 835 (Fla. 5th DCA 1990) (reversing trial court and preventing forfeiture, finding termination of an equitable property interest must "be done with equity's characteristic concern for fairness"). As emphasized in *White*, "[e]quity disregards all form and looks to the substance and essence of every matter." 566 So.2d at 835.

Here, Appellants' removal results in extreme forfeitures that are manifestly unjust because, in part: (i) Appellees received their essential, bargained-for benefits (*see* Argument_Section II.A, *supra*); (ii) Hunt refused to cooperate with the curative process and Appellants' cure efforts (*see* Argument_Section I.B and Facts_Section I.E.2, *supra*); (iii) Appellees did not pursue the breaches for over a decade (Argument_Section III.A, *infra*); (iv) Appellees have not been substantially prejudiced (Argument_Section III.B, *infra*); (v) Appellees still possess the cure payments (FV_DE222_350:10-25; FV_DE120-2_PageID2016, ¶24; PT_DE108-

2_PageID1913, ¶24); and (v) Hunt will seize an enormous windfall (Argument_Section III.C, *infra*).

### A.    Appellees' Delay in Enforcing the Breaches.

Under Florida law, forfeitures should not be enforced where the nonbreaching party (here Appellees) allowed a breach to continue until such time as it was advantageous to enforce it.  *Torres*, 632 So.2d at 111-12.  In *Torres*, the Florida appellate court concluded the failure to "promptly invoke" a contractual right upon breach, and instead allowing the breaching party to continue performing "despite the perceived violation," effectively "lulled [the breaching party] into believing that the [nonbreaching party] was not intending to enforce the perceived breach."  632 So.2d at 112.  The court held "it would be contrary to our concepts of equity and justice to allow the [nonbreaching party] to claim a forfeiture" under such circumstances.  *Id.*; *see also Varel v. Banc One Cap. Partners, Inc.*, 55 F.3d 1016, 1017 (5th Cir. 1995) (the nonbreaching party had previously "paid no attention" to the breach "until years later, when their lawyers were searching" for a means to avoid the breaching party's purchase rights).

As described in Facts_Section D.2, *supra*, Appellees were fully aware of Appellants' historic course of conduct since their admission to the Partnerships over a decade before Hunt acquired control, and ***never*** before issued a default notice or threatened removal.  Hunt is now opportunistically treating this historic practice as

a material default to obtain a windfall (as described below).  Forfeiture under such

circumstances is manifestly unjust.

**B.    Appellees were Not Substantially Prejudiced.**

In *Varel*, forfeiture of a right-of-first-refusal was held inequitable and extreme

because the nonbreaching party was not substantially prejudiced where the breached

provision "was not an essential part of the performance the lenders bargained for."

55 F.3d at 1017.    Courts routinely require "substantial prejudice" to the

nonbreaching party when addressing forfeiture.    *See Axis Surplus Ins. Co. v.*

*Caribbean Beach Club Ass'n, Inc.*, 164 So. 3d 684, 689 (Fla. 2d DCA 2014); *see*

*also Roschman Partners v. S.K. Partners I, Ltd.*, 627 So. 2d 2, 3-5 (Fla. 4th DCA

1993) (breach "not material" because "substantial increase in the subject property's

value" caused by breaching party benefitted the nonbreaching party); *Horatio*

*Enters., Inc. v. Rabin*, 614 So. 2d 555 (Fla. 3d DCA 1993) (denying forfeiture of

long-term sublease where "the landlords have received or will receive all the money

to which they are entitled"); *World Triathlon Corp, Inc. v. SRS Sports Ctr.*

*SDN.BHD*, No. 8:04-cv-1594-T24-TBM, 2005 WL 3445526, at *3 (M.D. Fla. Dec.

14, 2005) ("Florida courts do not blindly sanction unilateral termination of contracts

when a default causes no harm to the party seeking to avoid performance"); *Sahadi*

*v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 706 F.2d 193, 197-99 (7th Cir.

1983); *Am. Ins. Co. v. C.S. McCrossan, Inc.*, 829 F.2d 702, 705 (8th Cir. 1987). Such did not occur here.  (Argument_Section II and Facts_Section I.D.1, *supra*)

Moreover, in *Burger King Corp. v. Mason*, 710 F.2d 1480 (11th Cir. 1983), this Court, in affirming that agreements were wrongfully terminated absent material breaches, recognized three salient equitable principles that equally apply here: (i) "it is elementary that the mere breach of an agreement which causes no loss…will not sustain a suit…for damages, much less [equitable relief]"; (ii) "a party may not escape performance under a contract on the ground that a tender was not made by the date specified"; and (iii) courts "do not blindly sanction unilateral termination of contracts when a default causes no harm to the party seeking to avoid performance." *Id.* at 1489-90 (cleaned up; citing cases); *see also id.* (late performance can be cured "with due allowance for any damage caused by the tardiness").

As described in Argument_Sections I-II and Facts_Section I.D-E, *supra*, Appellees received their bargained-for tax benefits and the modest cash flow-related breaches were fully cured.  Thus, Appellees suffered no harm or substantial prejudice.  Indeed, if they had been, Appellees would not have allowed the breaches to occur for over a decade, and Hunt would have cooperated with Appellants' curative efforts during the cure period.  This too demonstrates that forfeiture here is manifestly unjust.

### C.    Hunt's Windfall.

A forfeiture should be disregarded where the nonbreaching party would receive a windfall.  *See Sharpe v. Sentry Drugs, Inc.*, 505 So.2d 618, 618-19 (Fla. 3d DCA 1987).  In *Sharpe*, despite willful and persistent violations of a lease agreement, the Florida appellate court concluded the breaches were "insufficient, as a matter of law, to support a forfeiture of the parties' entire lease." *Id.* at 619.  The court noted that a party may be relieved of a forfeiture "when the effect of enforcing a…default would result in an unconscionable, inequitable, or unjust eviction under the circumstances." *Id.* at 618.

In *Fowler v. Resash Corp.*, the Florida appellate court denied forfeiture despite breaches because, in part, the nonbreaching party would receive approximately $4.8 million in additional income as a result of the forfeiture, and such "would be unconscionable and inequitable, resulting in a tremendous windfall to the [nonbreaching party], and an even greater financial loss to the [breaching party], which would be manifestly unjust."  69 So.2d 153, 154 (Fla. 3d DCA 1985) (citing cases).

Here, through acquisition of Appellees for a $10,000 purchase price that allowed Hunt to seize control of limited partner interests in many other similar LIHTC partnerships, Hunt will receive a windfall of more than $9 million by removing Appellants, despite having contributed nothing to the Partnerships (*See*

59

Facts_Sections C.1 and E.1, *supra*) and Appellants will receive nearly nothing upon removal as they are divested of their super-majority of economic benefits. (FV_DE223_499:15-502:3)  In sum, endorsing Hunt's removal of Appellants was grossly inequitable, yet the District Court concluded that "the nature of the General Partners' misconduct and their lack of good faith in managing [the] [P]artnerships" outweighed the "the inequitable forfeiture of millions of dollars in equity potentially available if [the General Partners] were allowed to remain in the partnerships and exercise their purchase options."  (FV_DE173_PageID6467)  The court thus erred in concluding that removal would "not result in an impermissible or inequitable forfeiture." (*Id.*)

Based on the above, this conclusion is clearly erroneous and constitutes an abuse of discretion.  This manifest injustice requires reversal.

## IV.    THE COURT ERRED IN NOT APPLYING WAIVER OR ESTOPPEL

### A.    Waiver.

Waiver "encompasses not only the intentional or voluntary relinquishment of a known right, but also conduct that warrants [such] an inference…." *Singer v. Singer*, 442 So. 2d 1020, 1022 (Fla. 3d DCA 1983).  In *Bush v. Ayer*, 728 So. 2d 799 (Fla. 4th DCA 1999), a Florida appellate court—reviewing *de novo*—found that despite a purchaser's failure to strictly comply with a seller's offer, "the parties had proceeded in all respects as if a valid contract existed for the sale…and left no room

for a reasonable inference to the contrary." *Id.* at 800-802 (reversing trial court); *see also Torres*, *supra*, 632 So.2d at 112; *Colonial Penn Cmtys., Inc. v. Crosley*, 443 So.2d 1030 (Fla. Dist. Ct. App. 1983); *Multiquimica Dominicana v. Chemo Int'l, Inc.*, 707 F.App'x 692, 694-98 (11th Cir. 2017).

Here, Appellees continuously chose not to exercise their contractual rights although they were fully informed of the historic conduct, which led Appellants to reasonably believe removal would not occur based on the Advances, accrual of fees and priority distributions, or late reporting.  (Facts_Section D.2, *supra*); *see also Acosta v. Dist. Bd. of Trustees of Miami-Dade Comm. Coll.*, 905 So.2d 226, 228-29 (Fla. 3d DCA 2005); *MDS (Canada) Inc. v. Rad Source Technologies, Inc.*, 720 F.3d 833, 850 (11th Cir. 2013).  The District Court thus erred and should be reversed for allowing Appellees to remove Appellants.

### B.    Estoppel.

"Equitable estoppel is based on principles of fair play and essential justice and arises when one party lulls another party into a disadvantageous legal position." *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1076 (Fla. 2001).   "'The doctrine of estoppel is applicable in all cases where one, by word, act or conduct, willfully caused another to believe in the existence of a certain state of things, and thereby induces him to act on this belief injuriously to himself, or to alter his own previous condition to his injury.'" *Id.* (quoting *State ex rel. Watson v. Gray*, 48

So.2d 84, 87-88 (Fla. 1950)).  The doctrine allows courts "to avoid an unreasonable and unjust result."  *United Auto. Ins. Co. v. Chiropractic Clinics of S. Fla.*, 322 So. 3d 740, 744 (Fla. 3d DCA 2021).  For instance, in *Edelstein v. Peninsular Lumber Supply Co.*, 247 So. 2d 721 (Fla. 2d DCA 1971), a party was estopped from asserting rights because she purposely waited until there was a greater potential benefit to do so.  *Id.* at 722-23.

Here, Appellees "stood by without asserting" their contractual rights for over a decade.  (FV_DE222_373:1-7, 376:13-377:1, 376:13-378:19, 417:1-17)  Indeed, prior to 2019, Appellees never treated Appellants' breaches as material.  But, once Hunt and Mr. Kagey took control of Appellees, they immediately began "searching" for a basis to defeat or otherwise seize an unjustified windfall from Appellants, as is their business model.[31]  *See also Varel*, 55 F.3d at 1017.  The District Court committed reversible error in not applying equity to estop Appellees from doing so.

## CONCLUSION

The District Court's findings and conclusions that: (i) the breaches were not timely cured; (ii) the breaches were material; (iii) no manifest injustice results from removal and the General Partners' extreme forfeiture; and (iv) waiver and estoppel do not apply, should be reversed and the Matters remanded to the District Court with instructions to reinstate Appellants as the Partnerships' general partners.

---

[31] *See* Facts_Section E.1, *supra* (citing cases).

Dated:  June 23, 2023

                                   Respectfully submitted,

                                   */s/ David A. Davenport*

                                   David A. Davenport
                                   BC DAVENPORT, LLC
                                   105 5th Ave S, Suite 375
                                   Minneapolis, MN 55401
                                   (612) 445-8010
                                   (612) 445-8011 (fax)
                                   david@bcdavenport.com

                                   *Attorney for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this Brief complies with the applicable type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this brief contains 12,982 words. This certificate was prepared in reliance upon the word-count function of the word processing system (Microsoft Word) used to prepare this brief.

This Brief complies with the typeface requirements of Fed. R. Civ. P. 32(a)(5) and the type-style requirements of Fed. R. Civ. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, font size 14.

Date: June 23, 2023

*/s/ David A. Davenport*
David A. Davenport

*Attorney for Appellants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2023, I caused the foregoing to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. All participants in this Appeal are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ David A. Davenport*
David A. Davenport

*Attorney for Appellants*

65