# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

———————————

CREATIVE CHOICE HOMES XXX, LLC
F/K/A CREATIVE CHOICE HOMES XXX, INC.

*Appellant*,

v.

AMTAX HOLDINGS 690, LLC, AND
PROTECH 2005-C, LLC

*Appellees*.

———————————

On Appeal from the United States District Court for the Middle District of Florida
No. 8:19-cv-01903-TPB-AAS & No. 8:19-cv-01910-TPB-AAS

———————————

## ANSWER BRIEF OF THE APPELLEES
———————————

Steven F. Griffith, Jr.
Laura E. Carlisle
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, P.C.
201 St. Charles Avenue
Suite 3600
New Orleans, Louisiana 70170

sgriffith@bakerdonelson.com
lcarlisle@bakerdonelson.com

Desislava K. Docheva
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, P.C.
100 S.E. Third Avenue
Suite 1620
Fort Lauderdale, Florida 33394

ddocheva@bakerdonelson.com

ATTORNEYS FOR ALL APPELLEES

## APPELLEES' CERTIFICATE OF INTERESTED
## PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, the Appellees state that the following individuals and entities have an interest in the outcome of this case:

AMTAX Holdings 690, LLC - Defendant-Appellee in 23-10197

Baker, Donelson, Bearman, Caldwell & Berkowitz, PC - Attorneys for Defendants-Appellees

Bancroft, Zachary J. - Attorney for Defendants-Appellees

Barber, Hon. Thomas P. - U.S. District Judge for the Middle District of Florida

Barot, Dilip

Barot, Naimisha

BC Davenport, LLC - Attorneys for Plaintiff-Appellant

Cann, Eve A. - Attorney for Defendants-Appellees

Carlisle, Laura E. - Attorney for Defendants-Appellees

Creative Choice Homes XXX, LLC - Plaintiff-Appellant in 23-10197

Creative Choice Homes XXXI, LLC - Plaintiff-Appellant in 23-10198

Creative Choice Homes, Inc.

Davenport, David A. - Attorney for Plaintiff-Appellant

Dix, A. Evan - Attorney for Plaintiff-Appellant and Counter-Defendant-Appellant

Docheva, Desislava K. - Attorney for Defendants-Appellees

Flynn, Hon. Sean P. - U.S. Magistrate Judge for the Middle District of Florida

Griffith Jr., Steven F. - Attorney for Defendants-Appellees

Hill, Ward & Henderson, P.A. - Attorneys for Plaintiff-Appellant and Counter-Defendant-Appellant

Hunt Capital Partners, LLC

Impro Synergies, LLC - Counter-Defendant-Appellant in both cases

Jenkins, Justin H. - Attorney for Plaintiff-Appellant

McClaren, Scott A. - Attorney for Plaintiff-Appellant and Counter-Defendant-Appellant

MG Affordable Master, LLC - Defendant-Appellee in 23-10198

MG GTC Fund I, LLC - Defendant-Appellee in 23-10198

MG GTC Middle Tier I, LLC - Defendant-Appellee in 23-10198

Moody, Hon. James S. - U.S. District Judge for the Middle District of Florida

Protech 2005-C, LLC - Defendant-Appellee in 23-10197

Rychlak, J. Alexandra - Attorney for Defendants-Appellees

Sansone, Hon. Amanda Arnold - U.S. Magistrate Judge for the Middle District of Florida

Sundarsingh Law, P.L. - Attorneys for Plaintiff-Appellant

Sundarsingh, Mandell - Attorney for Plaintiff-Appellant

Zaroogian, Sean M. – Attorney for Plaintiff-Appellant

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Cir. R. 26.1-3(b), Appellees confirm that no publicly traded company or corporation has an interest in the outcome of the case or appeal.

# STATEMENT REGARDING ORAL ARGUMENT

Appellees respectfully submit that oral argument is unnecessary in this appeal.

This appeal asserts clear error in the factual findings of a trial court after a three day bench trial, in which four witnesses testified live from both the plaintiffs and defendants, another six witnesses testified via deposition, 120 exhibits were received into evidence, and the parties provided written closing arguments. After consideration of all the evidence, in a thirty-four page Order, the District Court issued detailed Findings of Fact and Conclusions of Law.

While the findings are certainly stirring, as they describe the Appellants' theft of hundreds of thousands of dollars of Partnership monies, fabrication of fraudulent business records to conceal it, and even their doctoring of the accounting records of one Partnership during the pendency of the case, there is no reasonable argument that "clear error" exists for any of the myriad findings by the District Court, and there is no legal issue meaningfully presented to this Court for which oral argument would be beneficial.

Therefore, Appellees respectfully submit that oral argument is not necessary to resolve this appeal.

# TABLE OF CONTENTS

Appellees' Certificate of Interested
Persons and Corporate Disclosure Statement .................................................. i

Statement Regarding Oral Argument ............................................... iv

Table of Contents ............................................... v

Table of Citations ............................................... viii

Statement of Jurisdiction ............................................... xi

Statement of the Issues ............................................... 1

Statement of the Case ............................................... 2

I.      Factual Background ............................................... 2

        A.      The Entities at Issue in this Dispute ............................................... 2

                1.      The Fountainview Partnership ............................................... 2

                2.      The Park Terrace Partnership ............................................... 5

                3.      The Role of Impro Synergies, the General Partners'
                        Affiliate and the Partnerships' Property Manager ........... 7

                4.      The Limited Partners' Asset Manager ............................ 8

        B.      The Partners Agree That
                the General Partners Can Be
                Removed For Certain Misconduct. ............................................ 9

        C.      The General Partners' Defaults ............................................... 12

                1.      The Fountainview Defaults ............................................... 13

                2.      The Park Terrace Defaults ............................................... 14

D. The General Partners, the Limited Partners, and the Third Party Auditor of the Partnerships All Agree the Money Taken by the General Partners Is Material. ... 15

E. Instead of Repayment, The General Partners Fabricate Construction Contracts with an Affiliate To Mask the Money Taken. ........... 19

F. Repeated Notices and Demands to Cure; the General Partners' Refusal to Cure, and Ultimate Removal of the General Partners. .............................. 22

1. The Limited Partners Provide Repeated Notices of Default Demanding Cure. .............. 23

2. Left with No Other Viable Option, the Limited Partners Removed the General Partners. ........... 25

3. Evidence at Trial Confirmed No Cure Occurred. ............ 27

II. Procedural History ................................................. 30

III. Standard of Review ............................................... 32

Summary of the Argument ........................................... 35

Argument ................................................................ 36

I. The Court Should Disregard the Appellants' Materials Beyond the District Court's Record. .................................... 36

II. The District Court's Factual Finding that The General Partners Failed to Cure Is Not Clearly Erroneous; In Fact, It Is Objectively Correct. ......................... 38

A. The Evidence of Failure to Cure Fountainview Defaults Cannot Be Reasonably Contested. ....... 40

B.    The Evidence of Failure to Cure
Park Terrace Defaults Cannot Be Reasonably Contested. ......... 42

C.    The General Partners' Belated Attempts to
Shift Blame to the Limited Partners for Allegedly
Failing to Cooperate with a Cure Should be Rejected. .............. 44

III.    The District Court's Factual Finding that the
General Partners' Defaults Were Material Was
Correct, Perfectly Consistent with the General
Partners' Own Testimony, and Not Clearly Erroneous. ........................ 45

IV.    The District Court's Factual Finding that
Contractually Agreed Removal of the
General Partners Would Not Cause Forfeiture Was Correct. ............... 51

V.    The District Court's Factual Finding that
No Waiver or Estoppel Occurred Is Not Clearly Erroneous. ............... 54

Conclusion ................................................................. 56

Certification of Compliance ........................................... 58

Certificate of Service ................................................... 59

# TABLE OF CITATIONS

**Cases**                                                                                   **Page(s)**

*Alliant Tax Credit Fund XVI, Ltd. v. Thomasville Community Housing, LLC*,
    No. 11-2234, 2013 WL 321548 (N.D. Ga. Jan. 28, 2013) ...............................47

*Anderson v. City of Bessemer City*,
    470 U.S. 564(1985) ........................................................................................33

*Bellitto v. Snipes*,
    935 F.3d 1192 (11th Cir. 2019) ....................................................................33

*Capital Bank v. Needle,*
    596 So. 2d 1134 (Fla. 4th DCA 1992) ...........................................................55

*Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*,
    556 F.3d 1232 (11th Cir. 2009) ....................................................................45

*Florida Polk Cnty v. Prison Health Services, Inc.*,
    170 F.3d 1081 (11th Cir. 1999) ....................................................................53

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
    572 U.S. 559 (2014) ......................................................................................34

*Holladay v. Allen*,
    555 F.3d 1346 (11th Cir. 2009) ....................................................................33

*Interline Brands, Inc. v. Chartis Specialty Ins. Co.*,
    749 F.3d 962, 966 (11th Cir. 2014) ...............................................................49

*Inter-Ocean Cas. Co. v. Hunt*,
    189 So. 240, 243 (Fla. 1939) ........................................................................50

*Lee Cnty Breach of NAACP v. City of Opelika*,
    748 F.2d 1473, 1481 (11th Cir. 1984).............................................................36

*Major League Baseball v. Morsani*,
    790 So. 2d 1071 (Fla. 2001) ................................................................ 54, 55

*Nelson v. Hansard*,
    197 So. 513 (Fla. 1940) ................................................................................52

*Preferred Sites, LLC v. Troup Cnty.*,
  296 F.3d 1210 (11th Cir. 2002) ...........................................................................33

*S.E.C. v. Merchant Capital, LLC*,
  483 F.3d 747, 754 (11th Cir. 2007) ...................................................................34

*Solymar Invs., Ltd. v. Banco Santander S.A.*,
  672 F.3d 981 (11th Cir. 2012) ...........................................................................45

*State Dep't of Revenue v. Anderson*,
  403 So. 2d 397 (Fla. 1981) .................................................................................55

*Stephen v. Tolbert*,
  471 F.3d 1173, 1177 (11th Cir. 2006) ...............................................................36

*Stinson, Lyons, Gerlin & Bustamante, P.A. v. Brickell Bldg. 1 Holdings Co., Inc.*,
  923 F.2d 810 (11th Cir. 1991) ...........................................................................53

*Stoltz v. Truitt*,
  940 So. 2d 521 (Fla. 1st DCA 2006) ..................................................................52

*Tartell v. S. Fla. Sinus & Allergy Ctr., Inc.*,
  790 F.3d 1253 (11th Cir. 2015) .........................................................................32

*Torres v. K-Site 500 Associates*,
  632 So. 2d 110 (Fla. 3d DCA 1994) ...................................................................53

*Varel v. Banc One Capital Partners, Inc.*,
  55 F.3d 1016 (5th Cir. 1995) .............................................................................53

*Waksman Enters., Inc. v. Oregon Props., Inc.*,
  862 So. 2d 35 (Fla. 2d DCA 2003) ....................................................................52

*White v. Brousseau*,
  566 So. 2d 832 (Fla. 5th DCA 1990) .................................................................53

## Statutes

26 U.S.C § 42 ........................................................................................................2

28 U.S.C. § 1291 ..................................................................................................xi

28 U.S.C. § 1332 ..................................................................................................xi

Fla. Stat. 83.49 ................................................................................17

**<u>Rules</u>**

11th Cir. R. 26.1 ........................................................... i, ii

Fed. R. App. P. 26.1 ..................................................... i, ii

Fed. R. App. P. 32 ..........................................................58

Fed. R. Evid. 801 ...........................................................42

Fed. R. Evid. 803 ...........................................................42

Fed. R. Evid. 806 ...........................................................42

**<u>Other Authorities</u>**

11 Fla. Jur 2d Contracts § 227 (June 2021 Update) .................................52

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction based on diversity jurisdiction under 28 U.S.C. § 1332. This Court has jurisdiction of this appeal under 28 U.S.C. § 1291 because it arises from the District Court's final judgment.

## STATEMENT OF THE ISSUES

The Appellants' issues on appeal are whether the District Court, after a trial on the merits, committed clear error by finding:

1.     The General Partners did not cure the defaults they committed under the respective limited partnership agreements?

2.     The General Partners' defaults were material?

3.     The General Partners' removal did not result in impermissible or inequitable forfeiture?

4.     The Limited Partners did not waive and were not estopped from pursuing their contractual removal rights?

This Court should affirm the District Court on all issues presented.

## STATEMENT OF THE CASE

Following a trial on the merits, the District Court made factual findings that the General Partners of two Partnerships took hundreds of thousands of dollars from the Partnerships, created false business records to mask the theft, refused to pay back the money when caught, and therefore were properly removed from the Partnerships. This appeal asks this Court to reach contrary factual conclusions and reinstate the General Partners into the Partnerships. The District Court should be affirmed.

## I.    Factual Background

There are two Partnerships at issue on this appeal: Fountainview and Park Terrace. They are each governed by the Low Income Housing Tax Credit Program ("LIHTC"), 26 U.S.C § 42, each provide affordable housing to low income families, and they operate in the Tampa, Florida area.

### A.    *The Entities at Issue in this Dispute*

#### 1.    The Fountainview Partnership

The Fountainview Partnership is governed by an Amended and Restated Agreement of Limited Partnership dated December 21, 2005 (the "Fountainview Partnership Agreement"). (D.E. 171-1.)[1] Prior to removal, the structure and ownership of Fountainview was:

---

[1] All references to the District Court's docket entries in this Brief will appear as "D.E. [#]" and refer to the District Court's docket in the lead case below, 8:19-cv-01903, and all page number references are to the page number that appears in the

- Creative Choice Homes XXX, Ltd., a Florida Limited Partnership, does business under the name Fountainview, (the "Fountainview Partnership"). (*Id.*)

- Creative Choice Homes XXX, LLC was the general partner of Fountainview, and it owned .01% of the equity in Fountainview.

- AMTAX Holdings 690, LLC was – and is – the investor limited partner of Fountainview, and it owned 99.98% of the equity in Fountainview.

- Protech 2005-C, LLC was – and is – the special limited partner of Fountainview, and it owned .01% of the equity in Fountainview. (*Id.*)

This structure is standard in the LIHTC industry.

The General Partner made only a nominal $100 capital contribution to the Fountainview Partnership, *id.*, and over the years, the Partnership paid the General Partner (and its affiliates) $68,362 in partnership management fees, $280,859 in cash flow distributions, $705,957 in incentive management fees, and $2,251,194 in developer fees, for a total of $3,306,312. (D.E. 222, Tr., Vol. 2, 182:5-9.) On the other hand, AMTAX Holdings 690, LLC (the investor limited partner) invested $10,571,017. (*Id.*; D.E. 171-1 at 118.)

The Fountainview Partnership Agreement entrusted the General Partner with "full, complete and exclusive" power to "manage and control the business" of the partnership. (D.E. 171-1 at 53, § 8.1.) As investors, the Limited Partners have no

---

header generated by the district court's electronic filing system, unless otherwise noted.

role in the day-to-day management of the partnership. (D.E. 222, Tr., Vol. 2, 178:25-179:11.) However, the Fountainview Partnership Agreement expressly provided that the General Partner "shall not have any authority" to "borrow from the Partnership or commingle Partnership funds with funds of any other Person," or "do any act in contravention of the Partnership Agreement." (D.E. 171-1 at 53-54, §§ 8.1(a) and 8.2(a)(v) & (vi).)

The Fountainview Partnership Agreement further required the General Partner to distribute Net Cash Flow from operations to all partners at the same time, and then only once a year, on the "Payment Date" (which is defined in the Fountainview Partnership Agreement as ninety days after the end of each fiscal year) in a specific order of distribution (D.E. 171-1 at 74-75, § 11.1(a).)[2]

The Limited Partners expected the General Partner to manage Fountainview according to the ground rules outlined in the Fountainview Partnership Agreement, namely, without abusing its broad and exclusive management authority and without commingling or misappropriating partnership funds, while also ensuring tax credit

---

[2] The testimony also confirmed that the General Partner: (1) had exclusive control of the partnership cash flow and bank accounts, (D.E. 222, Tr., Vol. 2, 179:12-180:3.); (2) was solely responsible for the yearly cash distributions (done once a year) to both the General Partner and the Limited Partners. (D.E. 222, Tr., Vol. 2, 203:15-22.), and (3) was required to keep cash in the Partnership until year-end because cash flow distributions were not earned until the end of the calendar year. (D.E. 222, Tr., Vol. 2, 200:7-24.)

and regulatory compliance. (D.E. 222, Tr., Vol. 2, 180:4–21.) It was also the Limited

Partners' expectation that the General Partner would not use the partnership bank

account as its "personal piggy bank." (*Id*.)

2. The Park Terrace Partnership

The Park Terrace Partnership is governed by an Amended and Restated

Agreement of Limited Partnership dated January 1, 2007 (the "Park Terrace

Partnership Agreement"). (D.E. 171-3.)[3] Prior to removal, the structure and

ownership of Park Terrace was:

- Creative Choice Homes XXXI, Ltd, a Florida Limited Partnership, does business under the name Park Terrace, (the "Park Terrace Partnership").[4]

- Creative Choice Homes XXXI, LLC was the general partner of Park Terrace, and it owned .01% of the equity in Park Terrace.[5] (D.E. 171-3.)

- MG Affordable Master, LLC was – and is – the investor limited partner of Park Terrace, and it owns 99.98% of the equity in Park Terrace. (D.E. 222, Tr., Vol. 2, 177:24-178: 4.)

---

[3] The Fountainview Partnership Agreement and the Park Terrace Partnership Agreement will be collectively referred herein as the "Partnership Agreements."

[4] The Fountainview Partnership and the Park Terrace Partnership will be collectively referred herein as the "Partnerships."

[5] The General Partner of the Park Terrace Partnership and the General Partner of the Fountainview Partnership will be collectively referred herein as the "General Partners."

- MG GTC Middle Tier I, LLC was – and is – the special limited partner of Park Terrace, and it owns .01% of the equity in Park Terrace. (*Id*.)[6]

Although named a defendant, MG GTC Fund I, LLC is not a partner in Park Terrace. (D.E. 222, Tr., Vol. 2, 178:5-10.)

The Park Terrace General Partner made only a nominal $100 capital contribution to the Partnership, *id.*, and over the years, the Park Terrace Partnership paid the General Partner (and its affiliates) $927,732 in partnership management fees, $631,696 in cash flow distributions, $1,258,275 in incentive management fees, and $3,194,373 in developer fees, for a total of $6,012,076. (D.E. 222, Tr., Vol. 2, 183:11-17.) On the other hand, MG GTC Middle Tier I, LLC (the investor limited partner) invested $18,725,900 in the Park Terrace Partnership. (D.E. 171-3 at 101.)

The Park Terrace Partnership Agreement also entrusted its General Partner with "full, exclusive and complete charge of the management of the business of the Partnership." (D.E. 171-3 at 37-38, § 4.1.) As investors, the Limited Partners have no role in the day-to-day management of the partnership. (*Id.*; D.E. 222, Tr., Vol. 2, 178:25-179:11.) The Park Terrace Partnership Agreement expressly provided that the General Partner had "no authority" to "… make loans on behalf of the

---

[6] The Limited Partners of the Park Terrace Partnership and the Limited Partners of the Fountainview Partnership will be collectively referred herein as the "Limited Partners."

Partnership, except with the Consent of the [Special] Limited Partner" or to "[p]ay any salary, fees or other compensation to … its Affiliates." (D.E. 171-3 at 43-44, § 4.4(B)(iii) and (xix).)

The Park Terrace Partnership Agreement required the General Partner to distribute Cash Flow from operations to all partners at the same time, and then only once a year, within 90 days of the fiscal year end, (D.E. 171-3 at 70-71, § 9.1), and in a similar order of distribution, (*Id*.).[7]

The Limited Partners of Park Terrace expected the General Partner to manage the partnership according to the ground rules outlined in the Park Terrace Partnership Agreement, namely, without abusing its broad and exclusive management authority and without commingling or misappropriating partnership funds, while also ensuring tax credit and regulatory compliance. (D.E. 222, Tr., Vol. 2, 180:4-21.) And, of course, it was the Limited Partners' expectation that the General Partner would not use the partnership bank account as its "personal piggy bank." *Id.*

### 3. The Role of Impro Synergies, the General Partners' Affiliate and the Partnerships' Property Manager

Both General Partners had the right to appoint a property manager to manage the Partnerships' properties. Impro Synergies, LLC ("Impro") was the property manager for both Partnerships from August 1, 2012 through its termination in May

---

[7] *See supra* n.2.

2022.  (D.E. 171-6, 171-7; D.E. 222, Tr., Vol. 2, 108:18-20.)  Impro was an affiliate of the General Partners.[8]

The General Partners, acting on behalf of the Partnerships, hired Impro to manage the Fountainview and Park Terrace properties, including marketing, renting, and maintaining the properties.  Impro was also responsible for the Partnerships' accounting and bank accounts, as well as maintaining all books, records, invoices, and other documents.  (D.E. 171-6, 171-7 at 2, 4-5, § 2(1)-(4), (10)-(11), (17)).

### 4.    The Limited Partners' Asset Manager

Hunt Capital Partners LLC ("HCP") syndicates and manages investments in LIHTC properties for third parties and affiliated entities.  HCP was engaged by an affiliate to manage the Limited Partners' interests in the Partnerships starting on January 1, 2019.  (D.E. 222, Tr., Vol. 2, 235:7-12; D.E. 223, Tr., Vol. 3, 55:24-25; 14:10-20.)  After the ultimate investors exercised put options, an affiliate of HCP was required to assume ownership of the Limited Partner interests as well.  (D.E. 223, Tr., Vol. 3, 59:5-11.)  As the District Court described it, HCP was the "new sheriff in town" that sought to hold the General Partners accountable for their

---

[8] Throughout years of litigation, Impro and the General Partners maintained that they were not affiliates.  (D.E. 222, Tr., Vol. 2, 10:15-11:3.)  Then, in the afternoon of Day 2 of Trial, counsel for the General Partners finally conceded in open court that, in fact, the entities were affiliated.  (D.E. 222, Tr., Vol. 2, 110:3-112:25.

continued misconduct in abusing partnership funds once the tipping point was reached. (D.E. 222, Tr., Vol. 2, 197:18-21.)

> B.    *The Partners Agree That*
> *the General Partners Can Be*
> <u>*Removed For Certain Misconduct.*</u>

In part because the Limited Partners had no control over Partnership management, they expressly contracted for removal rights in the unlikely event the General Partners committed specified actions.

<u>Fountainview:</u>  Section 8.15(a) of the Fountainview Partnership Agreement provides:

> The Investor Limited Partner and/or the Special Limited Partner shall have the right to remove the General Partner:
>
> (i)    for any intentional misconduct, malfeasance, fraud, act outside the scope of its authority, breach of its fiduciary duty, or any failure to exercise reasonable care with respect to any material matter in the discharge of its duties and obligations as General Partner (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the Partnership, the Limited Partners, the Project, or the assets of the Partnership), or
>
> (ii)    upon the occurrence of any of the following:
>
> . . . .
>
> (B)    the General Partner shall have violated any material provision of this Agreement, including without limitation, any of its guarantees pursuant to Section 5.1(d) or 8.8 or violated any material provision of applicable law (provided that such violation results in, or is likely to result in, a material detriment to or an impairment of the

> Partnership, the Limited Partners, the Project, or the assets
> of the Partnership) . . . .

(D.E. 171-1 at 65-66, §§ 8.15(a)(i)-(ii)(B).) Following trial, the District Court found

that the Fountainview General Partner's conduct constituted "intentional

misconduct, malfeasance, acts outside the scope of its authority, and breaches of its

fiduciary duty." (D.E. 173 at 25.)

The Fountainview Partnership Agreement further provides that, if its Limited

Partners determine that cause for removal exists, (1) they shall give notice to all

partners of such cause for removal, (2) the General Partner shall have thirty days to

cure any default, plus sixty days if it begins to cure within the thirty day period and

diligently and continuously pursues the cure, and (3) at the end of the time period, if

the General Partner has not cured the default or other reason for removal, upon

another Notice from the Limited Partners, it will cease to be the General Partner

unless it contests the removal in court. (D.E. 171-1 at 67, § 8.15(b).) Additionally,

the Fountainview Partnership Agreement does not allow amendments other than in

writing and expressly states that there can be no continuing waiver of subsequent

breaches. (D.E. 171-1 at 90, 96, §§ 14.1, 16.9.)

Park Terrace: Section 12.7 of the Park Terrace Partnership Agreement

provides:

> (A)     [The Special Limited Partner] shall have the right to remove and
> replace the General Partner: … if a Material Default occurs and

is not cured within the time period set forth in this Section 12.7….

(B)     Material Default means the occurrence of any of the following events:

(i)     a breach by any General Partner … in the performance of any of its obligations under this Agreement … and which has, or may reasonably be expected to have, a material adverse effect on the Partnership, the Apartment Complex, or the Investor Limited Partner; [or]

. . . .

(iv)    gross negligence, fraud, willful misconduct, misappropriation of Partnership funds, or a breach of fiduciary duty by a General Partner or any Affiliate of a General Partner providing services to or in connection with the Partnership or the Apartment Complex.

(D.E. 171-3 at 82-83, §§ 12.7(A), 12.7(B)(i) & (vi).)  Following trial, the District Court found the Park Terrace General Partner's conduct constituted "willful misconduct, misappropriation of Partnership funds, and breaches of its fiduciary duty."  (D.E. 173 at 25.)

The Park Terrace Partnership Agreement provides that, if the Special Limited Partner determines to remove the General Partner, it shall give written notice to the General Partner of the Material Default that is cause for removal.  For a Material Default under § 12.7(B)(i), the General Partner then has thirty days to cure the Material Default.  However, the General Partner has no right to cure any Material Default under (iv) for willful misconduct, misappropriation of Partnership funds, or breach of a fiduciary obligation.  (D.E. 171-3 at 83, § 12.7(C) (the "General Partner

11

shall have no right to cure any other Material Default [other than clauses (i) and (ii) described in Section 12.7B above." (*Id.*)

## C.    *The General Partners' Defaults*

For years, the General Partners denied the allegations of default. When presented at trial, they conceded defaults occurred, but pivoted to argue that their conduct did not justify removal. The District Court rejected the arguments.[9]

Under cross-examination, the owner of Creative Choice, Dilip Barot, repeatedly conceded the Partnership Agreements prohibited the General Partners he controlled from taking Partnership funds, at one point necessitating that the District Court interject:

| THE COURT: | Okay. Well, we don't need to be fighting about this, because I'll tell you right now, that's breach of contract. |
|---|---|
| THE WITNESS: | Thank you. |
| THE COURT: | Okay. In a criminal case, we'd say guilty. All right. That's breach of contract. You may not have thought it was, but it was. |
| THE WITNESS: | Yes. |

D.E. 222, Tr., Vol. 2, 34:3-10. Nevertheless, on appeal, the General Partners attempt to downplay the significance of their misconduct.

---

[9] Neither the Fountainview Partnership Agreement nor the Park Terrace Partnership Agreement contemplates "technical defaults" as the General Partners argued at trial, and the Court rejected their arguments. (D.E. 173 at 12.)

In fact, for years, the General Partners repeatedly stole money (the General Partners call them "advances," even though the money was not owed to them). The theft was rampant, with numerous transactions totaling hundreds of thousands of dollars in just the three years leading up to the trial. As the District Court found, the Limited Partners repeatedly demanded repayment, and the General Partners "at times returned some funds to the partnerships, only to withdraw funds again afterwards." (D.E. 173 at 11.)

As noted *supra*, the District Court concluded the Fountainview General Partner's actions "constituted intentional misconduct, malfeasance, acts outside the scope of its authority, and breaches of its fiduciary duty to the partnership, each of which is a ground for removal." (D.E. 173 at 25.) The District Court similarly concluded that the Park Terrace General Partner's actions "constituted willful misconduct, misappropriation of partnership funds, and breaches of fiduciary duty to the partnership, each of which is a ground of removal." (*Id.*)

### 1. The Fountainview Defaults

On April 14, 2017, the Fountainview Partnership's audited financial statements for 2016 were provided to the Limited Partners (the "FV 2016 Audit").[10]

---

[10] The General Partners were responsible for preparing the annual financial statements, and the Limited Partners were not required to approve the financial statements. (D.E. 222, Tr., Vol. 2, 181:2-12; 189:7-12.)

(D.E. 171-10.)  The FV 2016 Audit disclosed that Partnership money had been paid to an affiliate of the General Partner in 2016 and 2015, as well as that the distribution and application of cash flow had been made out of order and not in accordance with Section 11.1 of the Partnership Agreement.  (D.E. 171-10 at 5, 16-17.)  More specifically, the FV 2016 Audit disclosed that $140,577 was due from a General Partner affiliate as of December 31, 2016 and that the affiliate committed to repay the money during the year ended December 31, 2017. (*Id*.)  As it turned out, the money was not repaid in 2017.  (D.E. 171-20; D.E. 222, Tr., Vol. 2, 208:8-19.)

On September 15, 2018, the Fountainview Partnership's audited financial statements for 2017 were provided to the Fountainview Limited Partners (the "FV 2017 Audit").  (D.E. 171-16.)  The FV 2017 Audit stated that, in October 2017, $100,000 was paid to Naimisha Construction Inc. ("Naimisha"), an affiliate of the General Partner, pursuant to an interest-bearing Construction Advance Note for the development of detailed scope and repair costs plan for Fountainview.  (*Id*. at 16.) This Note, it would turn out, was fraudulent.  *See infra* Part I.E.

## 2.    The Park Terrace Defaults

On March 31, 2017, the Park Terrace Partnership's audited financial statements for 2016 were provided to the Limited Partners (the "PT 2016 Audit"). (D.E. 171-11.)  The PT 2016 Audit disclosed that money was taken in 2016, as well as that as the distribution and application of cash flow were made out of order and

not in accordance with Section 9.1 of the Partnership Agreement. More specifically, the PT 2016 Audit disclosed that $81,196 was due from the affiliate as of December 31, 2016. (*Id*. at 16-17.)

On September 15, 2018, the Park Terrace Partnership's audited financial statements for 2017 were provided to the Limited Partners (the "PT 2017 Audit"). (D.E. 171-17.) The PT 2017 Audit disclosed that, in October 2017, $100,000 was paid to Naimisha pursuant to an interest-bearing Construction Advance Note for the development of detailed scope and repair costs plan for Park Terrace. (*Id*. at 16.) The PT 2017 Audit further disclosed that $100,000 was due from Naimisha as of December 31, 2017 and that $3,261 was due from a separate unidentified affiliate of the General Partner. (*Id*.) Again, this Note was fraudulent. *See infra* Part I.E.

> D. *The General Partners, the Limited Partners, and the Third Party Auditor of the Partnerships All Agree the Money Taken by the General Partners Is Material.*

At trial, regarding <u>Fountainview</u>, the General Partner admitted the money taken from the Partnership was a "material amount." (D.E. 222, Tr., Vol. 2, 19:12-19.) The $87,883 taken from Fountainview was more than <u>all</u> the other cash on hand ($61,524) and represented approximately eight percent of the total annual rental revenue, amounting to roughly an entire month's worth of rent collections for the entire property. (D.E. 222, Tr., Vol. 2, 66:18-67:22.) The misappropriated amount

was material, and so was the underlying conduct of taking money from the partnership. (D.E. 223, Tr., Vol. 3, 73:10-25, 74:17-75:18.)

Similarly, regarding <u>Park Terrace</u>, the General Partner admitted the money taken from the Partnership was a "material amount." (D.E. 222, Tr., Vol. 2, 19:12-19.) The $103,261 taken from Park Terrace was more than <u>all</u> the other cash on hand ($92,598) and represented approximately seven percent of the total annual revenue, again amounting to roughly an entire month's worth of rent collections. (D.E. 222, Tr., Vol. 2, 67:23-69:22.) The total misappropriated amount was material, and so was the underlying conduct of taking money from the partnership. (D.E. 223, Tr., Vol. 3, 73:10-25, 74:1-16.)

Importantly, the General Partner was fully aware that the unilateral transfers of funds were grounds for defaults and admitted "heartburns." (D.E. 171-33.) Indeed, the Partnerships' general ledgers confirm money was taken on a regular basis in 2017, 2018, and even 2019. (D.E. 170, Def. Ex. 43, Excerpts 3-5, 13-15, 18, 22-23, 36-38, 40, 41-43, 52-53.) Shockingly, even after this dispute began, the General Partners continued to take money out of the Partnerships and simply kept using the Partnerships' bank accounts as personal piggy banks to take money as needed. (D.E. 222, Tr., Vol. 2, 95:9-18.)

In a "smoking gun" type moment at trial, the Partnerships' General Ledgers were presented to the District Court to confirm that on May 30, 2019 – after this

dispute had begun – the General Partners even stole $6,600 and $11,500 of cash from the low-income tenant security deposit accounts.[11] That conduct is criminal,[12] and it is certainly "material" when considering the General Partners' culpability.

The stolen money was used to fund other Creative Choice projects. (D.E. 222, Tr., Vol. 2, 228:24-229:6.) The recurring abuses of partnership funds resulted in less cash flow available for distribution to the Limited Partners, and less money for capital improvements, property upkeep, and maintenance. (D.E. 221, Tr., Vol. 1, 91:13-92:6; D.E. 222, Vol. 2, 195:19-196:18, 198:2-10.) In short, the District Court's factual findings that the defaults were material are supported by the General Partner's own testimony and the Partnerships' financial records.

Similarly, in early 2017, during the preparation of the 2016 audits, Baker Tilly[13] noted that the $140,576 balance of money taken from Fountainview was

---

[11] At trial, Defendants' Exhibit 43 was admitted, which was the General Ledger of both Partnerships for the years 2017, 2018, and 2019. (D.E. 223, Tr., Vol. 3, 90:8-91:13.) During testimony, Excerpts of Exhibit 43 were provided to the Court, all counsel, and the relevant witnesses. A copy of the Excerpts of Exhibit 43 will be attached to the Appellees' Supplemental Appendix. And, the testimony regarding the location in the financial records of the theft of tenant security deposits is at D.E. 223, Tr., Vol. 3, 104:3-107:9.

[12] *See* Fla. Stat. 83.49 (prohibiting a landlord from commingling funds from security deposits with any other funds).

[13] Pursuant to their broad management powers outlined in the Partnership Agreements, the General Partners select an independent auditor to audit the Partnerships' financial statements. (D.E. 171-1 at 53, § 8.1; D.E. 171-3 at 37-38, §

"material to the financial statements" and "not in accordance with the partnership." (D.E. 171-12 at 1.) Baker Tilly advised that if the receivable did not have an associated note agreement, GAAP (Generally Accepted Accounting Principles) required the balance to be disclosed as contra-equity. (D.E. 171-13.)

On March 27, 2018, during the preparation of the 2017 audits, Baker Tilly again advised the General Partners that due to the lack of repayment terms and a written receivable agreement, "[f]or both these properties, the characteristics have become such that the balance is significant to the financials and no longer appears to be a true asset receivable … [and should] be classified as contra-equity." (D.E. 171-24 at 1.) The concept of contra-equity, however, would confirm the money was taken from the Partnerships without an intention to have it paid back. (D.E. 222, Tr., Vol. 2, 211:12-213:12.)

Also on March 27, 2018, the Limited Partners' representative, Rick Fussell, reviewed draft 2017 financials and discovered the intent to treat the money taken as contra-equity; he immediately notified the General Partners that the Partnerships had "to be reimbursed these funds and they need to be distributed in accordance with the partnership agreement." (D.E. 171-24 at 2.) The contra-equity presentation was a "red flag" and "a major problem"—and the "catalyst" for the ultimate removals

---

4.1.) Here, the General Partners selected Baker Tilly, a national firm with an expertise for LIHTC properties.

because the Limited Partners had fiduciary duties to their own investors and could not allow partnership funds to be taken with no intent of ever being paid back. (D.E. 222, Tr., Vol. 2, 212:2-12.)

E.  *Instead of Repayment,*
    *The General Partners Fabricate Construction*
    *Contracts with an Affiliate to Mask the Money Taken.*

On August 28, 2018, leading up to the September 15, 2018 release of the Partnerships' 2017 audited financial statements, the General Partners' chief financial representative, Ashok Kumar, advised Baker Tilly that Naimisha provided the Partnerships with promissory notes to evidence the money taken as a receivable. In turn, on August 29, 2018, Baker Tilly and the General Partners discussed the purported "promissory notes." (D.E. 171-27.) Later the same day, the General Partners' accounting representative, Yash Pal Kakkar, emailed to Baker Tilly an executed "Fountainview Naimisha Note" and an executed "Park Terrace Naimisha Note" (the "Naimisha Notes"). (D.E. 171-27.)

Despite the word Note in the title, the Naimisha Notes were not promissory notes – they were contracts, falsely stating that Naimisha had earned and been paid the money at issue in exchange for professional services.

---

**CONTSTRUCTION ADVANCE NOTE**

$ 100,000.00                                                    October 10, 2017

FOR VALUE RECEIVED, the undersigned, **Naimisha Construction, Inc.,** a Florida corporation (hereinafter called the "Maker"), with an address at 8895 N. Military Trl. Suite 202E, Palm Beach Gardens, Florida 33410, hereby promises to pay to the order of **CREATIVE CHOICE HOMES XXX, LTD,** a Florida limited partnership, with an address at 8895 N. Military Trl. Suite 201E, Palm Beach Gardens, Florida 33410, (hereinafter called the "Holder"),  or such other place as the Holder of the Note may from time to time appoint in writing, the principal sum of **One Hundred Thousand and xx/100 DOLLARS ($100,000.00)** together with interest from the date hereof on the unpaid principal amount hereof from time to time outstanding at a rate per annum equal to that provided for below.

1.      <u>Related Documents.</u>

The payment has been made to Maker to develop a plan to develop a detailed scope and cost plan by December 31, 2018. Upon approval of the repair plan, Naimisha Construction may apply the Note amount as an mobilization advance against proposed repairs. This Note is unsecured and is not entered into in conjunction with a Mortgage or Security Agreement.

---

(D.E. 171-27 at 2.)  The fraud around the Notes was revealed at trial:

- Yash Pal Kakkar was the Manager of the General Partners.

- Yash Pal Kakkar was also the President of Naimisha.

- On August 29, 2018, Mr. Kakkar executed only the signature pages of the Naimisha Notes, while the Notes were backdated to October 10, 2017.  (D.E. 223, Tr., Vol. 3, 156:2-158:6.)

- In fact, Mr. Kakkar did not have the full Naimisha Notes upon execution, did not read them, and was unaware (as the President of Naimisha) of the obligations contained in them.  (*Id.*)

- Naimisha was never actually paid any money from the Partnerships.  (D.E. 222, Tr., Vol. 2, 19:7-11; D.E. 223, Tr., Vol. 3, 158:13-15.)

- Naimisha never actually did any work for the Partnerships. (D.E. 222, Tr., Vol. 2, 19:7-11; D.E. 223, Tr., Vol. 3, 158:9-19.)

- The Notes required repayment of unearned funds by December 31, 2018.  But, when that did not occur, in April of 2019, Mr. Kakkar signed addenda to the Notes, which were, once again, backdated – this time to December 6, 2018.  (D.E. 170-8, Def. Ex. 19.)

Importantly, through this scheme, the General Partners converted "advances" that they owed to the Partnerships into payment for services rendered to a third party, of whom the Limited Partners had no knowledge and with whom the Limited Partners had no contractual privity. And, if Naimisha failed to honor the terms of the "Notes," the only way for the money to be returned to the Partnerships was for Mr. Kakkar on behalf of the Partnerships to authorize a lawsuit against Naimisha, where he was President. Stated differently, this transaction made repayment certain not to occur.

Importantly, the Limited Partners did not invite the creation of the Naimisha Notes, did not authorize them, and did not consent to their creation and execution. (D.E. 222, Tr., Vol. 2, 220:5-222:4.) The Limited Partners did not even learn of the Naimisha Notes' existence until September of 2018 when they received the 2017 audits first mentioning them, and it was solely through the litigation process that the Limited Partners ever received copies. (*Id*.)

The Naimisha Notes were created and executed with the intent to cover up the substantial money taken in 2016 and 2017, which Baker Tilly considered to be material to the financial statements. (D.E. 171-12, 171-13, 171-15, 171-24.) Yet, the General Partners claim that the "Notes were never intended to mislead or defraud anyone; rather, the Notes were required by Baker Tilly to keep Advances as balance

sheet assets." (Appellants' Br., p. 27).[14] In short, the General Partners disingenuously imply that Baker Tilly urged them to create fraudulent notes – an assertion advanced at trial by counsel, untethered to the testimony of any witness for the General Partners, Impro, or Baker Tilly, and ultimately rejected by the District Court. (D.E. 223, Tr., Vol. 3, 68:20-69:13; D.E. 173 at 14-15.)

F.  *Repeated Notices and Demands to Cure; the General Partners' Refusal to Cure, and Ultimate Removal of the General Partners.*

As noted, the District Court concluded that the repeated "unauthorized withdrawals and loans" to affiliates constituted grounds for removal based on intentional or willful misconduct, malfeasance, acts outside of the scope of authority, breaches of fiduciary duty, and misappropriation of partnership funds. (D.E. 173 at 24-25.) Assuming the General Partners' defaults were curable, such cure was a simple two-step process: (1) the General Partners pay the money back to the Partnerships; and (2) the Partnerships pay the Limited Partners any amounts to which they were entitled. (D.E. 221, Tr., Vol. 1, 227:17-228:17; D.E. 222, Tr., Vol. 2, 41:9-18; D.E. 223, Tr., Vol. 3, 48:11-19.)

---

[14] All references to page number(s) in the Appellants' Brief is to the page number within the Brief.

1.      The Limited Partners Provide
Repeated Notices of Default Demanding Cure.

On March 25, 2019, the Limited Partners wrote to the General Partners regarding the improper "advances" of Partnership funds.  The letters demanded that the General Partners (1) pay back the money improperly taken and (2) pay the Limited Partners the amounts to which they were entitled under the Partnership Agreements.  (D.E. 171-36, 171-37.)  The General Partners ignored the letters.  (D.E. 222, Tr., Vol. 2, 223:8-18; D.E. 223, Tr., Vol. 3, 75:19-23.)

On April 9, 2019, the Limited Partners followed up again with the General Partners, asking for an "immediate response" to the March 25 letters.  (D.E. 170-7.) The General Partners ignored that communication.  (D.E. 223, Tr., Vol. 3, 75:24-25.)

On April 15, 2019, the Limited Partners wrote to the General Partners reiterating the issues and demanding that the General Partners remedy those issues by April 26, 2019; otherwise, the Limited Partners would be forced to formally place the General Partners in default and, if necessary, remove them from the Partnerships. (D.E. 171-40, 171-41.)  Again, the General Partners ignored the letters.

On May 3, 2019, the Limited Partners served the General Partners with a formal Notice of Default for Fountainview and a Notice of Material Defaults and Removal for Park Terrace. (D.E. 171-42, 171-43.)   In the Notices, the Limited Partners detailed the misconduct outlined above and allowed the General Partners 30 days, or until June 3, 2019, to cure.  The Limited Partners yet again specified the

cure required to address the defaults: (1) "returning the funds to the Partnership[s] in full and providing evidence of same, failure of which will result in [] removal," and (2) the General Partners cause the Partnerships to "pay the Limited Partners all amounts due to them under the Partnership Agreement[s]."[15] The General Partners again did nothing.

Between May 3 and June 3, 2019, the General Partners' sole communication was a short email from their counsel dated May 29, 2019, introducing himself and asking that all future notices be directed to him.

Then, on June 3, 2019 (the cure deadline), the General Partner's counsel wrote to the Limited Partners' counsel stating that the General Partners intended "to make [] loan(s)" to the Partnerships[16] (which was not a cure, but a further default), and he asked for an additional seven days to do so. (D.E. 171-49.) Those seven days elapsed without the General Partners curing any defaults, and with no further information from the General Partners. At that juncture, it became impossible for

---

[15] Notably, even after receiving the Limited Partners' various letters, the theft did not stop. (D.E. 223, Tr., Vol. 3, 102:7-13.) For example, $60,500 was withdrawn from the Park Terrace Partnership between May 15 and June 19, 2019. (D.E. 170, Def. Ex. 43, Excerpts at 52.) During that same period, the General Partners stole a portion of tenant security deposit accounts. (D.E. 223, Tr., Vol. 3, 104:3-107:9.)

[16] Of course, an attempt to cure by causing the Partnerships to go into debt through loans to pay the Limited Partners money is not a cure of theft; a cure for theft is to pay the money back.

the Limited Partners to trust and do business with the General Partners.  (D.E. 223, Tr., Vol. 3, 60:1-25.)

> 2.     Left with No Other Viable Option, the
>        Limited Partners Removed the General Partners.

After having provided repeated notices, and receiving no response or vague responses, and definitely no evidence of cure, the Limited Partners were left with no viable option but to remove the General Partners – the only remedy provided for in the Partnership Agreements, and one that imposes considerable burden on the Limited Partners.

On June 18, 2019 (fifteen days after the cure deadline and eight days after the General Partners' requested extension), the Limited Partners notified the General Partners of their removal from the Partnerships.  (D.E. 171-51, 171-53.)  After removal, on June 19, 2019, the General Partners offered to issue Checks to the Limited Partners regarding a portion of the cure – on the condition that the Limited Partners withdraw the Notices of Removal, release their claims, and without specifying what amounts would be curing what defaults.  (D.E. 171-54.)  This was the first indication from the General Partners that they might consider cures. (D.E. 223, Tr., Vol. 3, 36:1-16.)

On June 20, 2019, the Limited Partners detailed the history of their demands to the General Partners to rectify the misconduct and the General Partners' failure to do anything.  The Limited Partners again explained that "cure" could not be achieved

through loans (loans are prohibited by the Partnership Agreements), as well as the expectation for a smooth transition of the Partnerships' management given that the business relationships with the General Partners could not continue. (D.E. 171-55, 171-56, 171-57.) In response, the General Partners threatened to call the police. (D.E. 171-58.)

On June 21, 2019, the General Partners sent one check *from each partnership* (the "Checks") to the Limited Partners with no explanation what the Checks represented: $105,994 (Fountainview) and $141,235 (Park Terrace). (D.E. 171-59.) On their face, the Checks were insufficient to evidence (1) repayment of stolen funds to the Partnerships by the General Partners; or (2) amounts owed to the Limited Partners. (D.E. 223, Tr., Vol. 3, 31:6-22.) Additionally, the General Partners could not "cure" by "borrow[ing] from [the Partnerships'] current year operations to pay for the prior sins." (*Id*.)

On June 24, 2019, the General Partners asked for a "status" update on the Limited Partners' position regarding the "cure." In response, on June 28, 2019, the Limited Partners yet again detailed the issues with the purported "cure" efforts and additionally outlined a proper cure: (1) proof of repayment to the Partnerships, and (2) proof of payment from the Partnerships to the Limited Partners of all amounts owed. (D.E. 171-60, 171-61.)

On July 5, 2019, the General Partners emailed again, feigning ignorance of what the Limited Partners needed as far as "cure." (D.E. 171-64.) The July 5, 2019 email attached a letter dated June 3, 2019, purporting to respond to the Limited Partners' June 28, 2019 correspondence. The same day, on July 5, 2019, the General Partners filed the lawsuits.

### 3. Evidence at Trial Confirmed No Cure Occurred.

Contrary to the General Partners' suggestion that they cured with the issuance of the Checks on June 19, 2019 – which obviously would have been untimely – evidence at trial confirmed that no such cures ever occurred, and the Checks were mirages designed to suggest that a cure had been effectuated. Of course, the General Partners' theft made any belated attempts to cure virtually impossible without external cash infusions. As Baker Tilly advised the General Partners on June 3, 2019—the same day the seven-day extension was requested—the Park Terrace Partnership did not have the cash to pay what was due to the Limited Partners. (D.E. 171-48 at 1.) The solution was for the General Partners to pay back the stolen money; instead, they caused the Partnerships to go into debt to cover the Checks, in further violation of the Partnership Agreements.

Internal communication between Mr. Kakkar and Mr. Kumar (two General Partner representatives) dated July 3, 2019—after the Checks were issued—confirmed that a Fountainview Partnership loan of $77,000 was required to cover

27

the $105,994 Fountainview check and that a Park Terrace loan of $116,000 was required to cover the $141,295 Park Terrace check.  (D.E. 170-9, Def. Ex. 22.)  During the subsequent audit review, Mr. Kumar told Baker Tilly that the Fountainview Partnership owed $54,500 to Impro for "advances made from Impro to cover outstanding distributions" to the Limited Partners and that the "54,000 from Impro Synergies … is a short term loan."[17]  (D.E. 171-70.)  In fact, the 2019 audit for the Fountainview Partnership revealed an Accounts Payable increase of almost $54,000 which was admitted as reflecting the loan from Impro.  (D.E. 171-68; D.E. 222, Tr. Vol. 2, 76:21-24.)  During trial, through sworn Interrogatory Answers, Impro testified the money for the two Checks came from Impro.  (D.E. 170-14 at 45, 170-15 at 45, Interrogatory Resp. No. 11.)  All this was consistent with the General Partners' June 3, 2019 communication that "loan(s)" were intended to "cure."  (D.E. 171-49.)

Then, in yet another "smoking gun" moment of the trial, the District Court was presented with internal emails from the General Partners confirming an

---

[17] The Fountainview General Partner lacks the authority to "borrow in excess of $10,000 in the aggregate at any one time outstanding on the general credit of the Partnership."  (D.E. 171-1 at 55, § 8.2(b)(ii)).

alteration of the Park Terrace General Ledger to make it appear as though a cure had

occurred in September of 2019:[18]



Sent:       Wed, 6 Nov 2019 21:01:42 +0000
From:       Ashok Kumar <"/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=094DE263490A4141902F2F479A6E5BD9-ASHOK">
To:         Sanjay Parmar <"/o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=04f4d963f31b4b80aedc4c96f066e869-sanjay">, Yashpal Kakkar
<"/o=ExchangeLabs/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=67e4f90c3dcd438596714e0097901d76-ykakkar">
Cc:         gopi@creativechoice.net
Subject:    Park Terrace - DTA : URGENT
CCH XXXI DTA 0919.pdf

Sanjay, Attached is DTA for 2019 which shows almost $92,554 and $36K (account # 12090) due from affiliates. I want those DTA
return the funds so there is no DTA. Identify those and we need to cut the check from those entities for approx.. $130K and show
as deposit in CCH XXXI as of 09/30/2019. Send me how would do so I can discuss internally.

In November, I can process distribution so cash comes back after paying LP approx.. $30K.

Also, change the date of last Insurance refund to 9/30.

Call me with questions but this needs to be done urgently.
Thanks
Ashok
561-209-7244

D.E. 170-10, Def. Ex. 26; D.E. 171-66). So, in November 2019, (1) money was

deposited into the Park Terrace account to clear the balance of money due from the

affiliates,[19] (2) which money was taken from other properties (which creates

obligations for the Partnership to return the money), and (3) the accounting records

---

[18] Mr. Barot testified he believed he had until September to cure defaults.  D.E. 222, Tr., Vol. 2, 82:19-24; 83:14-16.

[19] In fact, the plan—as outlined by Mr. Kumar on November 7, 2019—was to make it appear that money was being returned to the Partnership, but with the intention to process another transaction in November to have the money returned to the General Partner.  (D.E. 171-66.)

were doctored to make it look like the transaction took place in September 2019. Notably, all this happened <u>during this case</u>.  (D.E. 222, Tr., Vol. 2, 86:14-91:24.)

Cure would have been simple: (1) the General Partners pay the money back, and (2) the General Partners cause the Partnership to pay the Limited Partners what they were owed.  Ultimately, no "cures" occurred because step one—returning all misappropriated funds back to the Partnerships—was never completed.  (D.E. 223, Tr., Vol. 3, 53:8-15.)  Instead of returning the Partnerships' funds, the General Partners attempted to jump to step two by issuing Checks to the Limited Partners from funds borrowed by the Partnerships, while retaining the remaining misappropriated funds.  (D.E. 223, Tr., Vol., 3, 119:8-10.)  No evidence was presented to the Limited Partners that the Checks represented current amounts or were based on analysis performed by Baker Tilly.  (D.E. 223, Tr., Vol. 3, 54:2-9.)

## II.  <u>Procedural History</u>

On July 5, 2019, the General Partners filed virtually identical Complaints alleging: (1) declaratory relief regarding the Limited Partners' attempts to remove, and (2) damages.  (D.E. 1-2.) On December 4, 2019, the Limited Partners filed Counterclaims asserting: (1) damages for breach of contract, (2) damages for breach of fiduciary duty, and (3) declaratory relief regarding the removal.  (D.E. 18.)  The Limited Partners also brought claims against Impro for declaratory relief that upon removal of the General Partners, Impro's management role was terminated. *Id.*

The District Court conducted a three day bench trial, receiving testimony from:

- Dilip Barot, owner of the General Partners (live);

- Yash Pal Kakkar, Manager of the General Partners and President of Naimisha Construction (live);

- Daniel Kagey, Chief Financial Officer of HCP (live);

- Rick Fussell, Asset Manager of HCP (live);

- Baker Tilly, the third-party Auditor and Accountant of the Partnerships (deposition);

- Anju Kumar, contractor for the General Partners (deposition);

- Nathan Orzech, Manager for Impro (deposition);

- Tiffany Williams, Asset Manager for HCP (deposition);

- Jenette Smith, Asset Manager for HCP (deposition); and

- Mary Stoddard, Asset Manager for HCP (deposition).

The District Court also accepted each party's Expert Reports into evidence, by consent of the parties, and it also admitted 120 Exhibits into evidence. Then, both sides submitted written closing arguments.

On April 5, 2022, the District Court issued its Findings of Fact and Conclusions of Law. (D.E. 173.) The District Court found that the General Partners breached the Partnerships Agreements in multiple respects to commit defaults through intentional and willful misconduct, repeatedly misappropriating partnership funds to advance to their affiliates. (D.E. 173 at 2, 24-25.) The District Court also

found that the General Partners breached their fiduciary obligations to the Limited Partners. *Id.* The District Court further found that the General Partners did not cure their defaults and had to be removed from the Partnerships. (*Id*. at 2, 16-18, 29-30.) The District Court declared the General Partners removed "upon entry of Judgment" and Impro's management agreement terminated "thirty days from entry of Judgment." (D.E. 173 at 33-34.) The District Court dismissed the General Partners' claims with prejudice. (D.E. 173 at 32.)

On April 6, 2022, the Judgments were entered dismissing all of the General Partners' claims with prejudice, declaring the General Partners removed effective the same date, and declaring Impro's management agreement terminated effective 30 days from the entry of judgment. (D.E. 174.) Thus, Impro's management agreements were terminated effective May 6, 2022.

On May 3, 2022, the General Partners filed Rule 59(e) Motions. (D.E. 178.) On December 19, 2022, following delay caused by the General Partners' improper bankruptcy petitions, the District Court denied the Rule 59(e) motions. (D.E. 216). On January 18, 2023, the General Partners appealed the Judgments. (D.E. 217.)

### III.   Standard of Review

In an appeal from a bench trial, the District Court's conclusions of law are reviewed *de novo* and its factual findings are reviewed for clear error. *Tartell v. S. Fla. Sinus & Allergy Ctr., Inc.*, 790 F.3d 1253, 1257 (11th Cir. 2015). "Clear error

is a highly deferential standard of review." *Bellitto v. Snipes*, 935 F.3d 1192, 1197 (11th Cir. 2019).  Findings of fact are clearly erroneous when, after viewing all the evidence, we are "left with the definite and firm conviction that a mistake has been committed." *Id.* at 1197 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Holladay v. Allen*, 555 F.3d 1346, 1354 (11th Cir. 2009) (quoting *Anderson*). "In applying the clearly erroneous standard to the findings of a District Court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." *Anderson*, 470 U.S. at 573 .

The issues implicated in this appeal relate to factual findings reviewable under the clear error standard.  Contrary to the General Partners' contention, the standard of review regarding the District Court's rejection of the argument that removal resulted in equitable forfeiture is not abuse of discretion.  (Appellants' Br., p. 39.) The General Partners misapply *Preferred Sites, LLC v. Troup Cnty.*, 296 F.3d 1210, 1220 (11th Cir. 2002), which stated that a District Court's "decision to grant or deny equitable relief" is reviewed for abuse of discretion.  Here, the parties' claims are based on breach of contract and declaratory relief related to contractual removal provisions; the relief is not equitable; therefore, the abuse of discretion standard does not apply.  Similarly, the defense to that claim on equitable grounds (grounds that

were not adequately proved) is insufficient to overcome the factual findings that preclude their application.

Finally, the General Partners misstate *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.* which also did not find that abuse of discretion applies to equitable forfeiture. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559 (2014). In fact, the *Highmark* opinion did not even include the word "equitable" as it did not involve a claim for equitable relief. A district court's finding on materiality is reviewable for clear error. *S.E.C. v. Merchant Capital, LLC*, 483 F.3d 747, 754 (11th Cir. 2007).

# SUMMARY OF THE ARGUMENT

The District Court did not commit any clear errors in its findings. The record is voluminous and clear: the General Partners stole material amounts of partnership funds and were caught. The General Partners then created fraudulent documents to cover up their theft, and again were caught. Finally, the General Partners never "cured" as they never actually repaid stolen funds and, in fact, committed more defaults in an attempt to alter financial records to suggest a cure actually did occur.

The General Partners were given ample notice and opportunity to return the misappropriated funds to the Partnerships (both before and after being served with formal notices of default), but they failed to cure. The Limited Partners only option was to exercise their contractual removal rights to end the General Partners' repeated misconduct. Considered in its totality, the record does not create a definite and firm conviction that the District Court made any mistake when it confirmed the General Partners' removal for committing defaults that were both material and not cured.

The District Court similarly made no mistake finding that the General Partners' removal did not result in impermissible or inequitable forfeiture, as it was an expressly contracted option available to the Limited Partners who did not waive and were not estopped from pursuing removal. Given the highly deferential standard of review that applies to all issues raised in this appeal, the District Court's Judgments removing the General Partners should be affirmed.

# ARGUMENT

## I. The Court Should Disregard the Appellants' Materials Beyond the District Court's Record.

In this appeal of a verdict following a three-day bench trial, but finding no support in the record from trial, the Appellant strays beyond the record for attempted support. An appellate court may "consider only evidence that was part of the record before the district court." *Stephen v. Tolbert*, 471 F.3d 1173, 1177 (11th Cir. 2006) (citation omitted). In fact, "federal appellate courts will not consider evidence that was not part of the trial record." *Lee Cnty Breach of NAACP v. City of Opelika*, 748 F.2d 1473, 1481 (11th Cir. 1984).

As the District Court stated, "[t]his case has to be decided on the facts of this case." (D.E. 223, Tr., Vol. 3, 35:14-23.)[20] As the District Court found, the General Partners' contentions that HCP "acted with improper motive and as part of a campaign to improperly oust general partners of affordable housing projects in order to acquire their equity" were not "supported by the evidence presented at trial." (D.E. 173 at 22.)

Yet, in this appeal, the General Partners devote roughly ten pages to "The Emergence of Aggregators" and the "Background and Congressional Intent" of the

---

[20] However, as Mr. Kagey testified, out of 750 LIHTC deals involving HCP, removal had been pursued against about five general partners (including the two at issue here). (D.E. 223, Tr., Vol. 3, 36:1-16.)

LIHTC program and cite to materials which were not presented at trial – and are not therefore part of the record. (Appellants' Br., pp. 4-13). As a result, all such extraneous material should be disregarded on appeal.

First, the "aggregator" is a marketing term, coined by Appellants' counsel, presumably to generate clients such as the General Partners. *See* "Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing," Washington State Hous. Fin. Comm'n, at p. 1 and n.20; *available at* www.wshfc.org/admin/Reporton15YearTransferDisputes.pdf (Sept. 2019) (accessed 8/14/23) (citing opposing counsel as having "dubbed" the term "aggregators" in earlier advocacy pieces). Over time, opposing counsel has built a practice focused on the theory and persuaded certain Courts to enter orders drafted by counsel which use the term in a pejorative manner. But, the issues in those cases focus on tax implications of positive capital accounts and the exercise of options to purchase property; those facts and arguments are not relevant here.

Second, here, every single default at issue was *exclusively* within the General Partners' control to commit (or not commit); there is no action the Limited Partners or their manager could take to force the General Partners to steal. If the General Partners did not want to find themselves in default, they simply had to:

1. Not steal, or

2. Once caught, pay the money back.

The General Partners chose not to do so, and the intent of the Limited Partners (whether noble or nefarious) can have no bearing on the General Partners' choices. This Court should reject the arguments.

## II.    The District Court's Factual Finding that The General Partners Failed to Cure Is Not Clearly Erroneous; In Fact, It Is Objectively Correct.

The District Court made extensive findings that: (i) the General Partners did not cure by the June 10, 2019 extension they requested, (ii) the purported "cure" Checks were funded with loans from Impro, and (iii) the November 2019 "cure" transaction in Park Terrace was too late.  (D.E. 173 at 30.)

Contrary to the record, the General Partners baldly contend that the "identified breaches were fully cured."[21]   (Appellants' Br., p. 42.)   For this contention, the General Partners point to the Checks sent on June 21, 2019.  But the Checks, drawn on the Partnerships' bank accounts, were issued after the cure window closed on June 10, 2019, following the seven-day extension the General Partners requested on June 3, 2019.  The District Court expressly found that "no payment and no evidence of cure regarding any of the defaults" were provided during the relevant period. (D.E. 173 at 16.)

---

[21] It bears repeating that the Park Terrace Partnership Agreement does not allow for a cure period for defaults based on misappropriation of partnership funds. (D.E. 171-3 at 83, § 12.7(C).)

The General Partners further misstate[22] the record to argue that "Mr. Fussell admitted during trial that Baker Tilly's determination of what the Limited Partners were owed would be an adequate cure." (Appellants' Br., pp. 31-32.) Instead, Mr. Fussell identified the two-step "cure" process when he testified that Baker Tilly could have done analysis to "say [1] this is what [the] general partner owes to the partnership, and [2] this is what the partnership owes the limited partners." (D.E. 222, Tr., Vol. 2, 165:15-22.)

In any event, on June 3, 2019, Baker Tilly emailed Mr. Kumar to advise that the calculations for Park Terrace "seem[ed] off" and cash flow appeared incorrectly calculated after 2015. (D.E. 171-48.) Instead, the General Partners belatedly issued the Checks from borrowed funds by jumping to step two, without disclosing the underlying analysis and while retaining the stolen funds. (D.E. 223, Tr., Vol., 3, 119:8-10.) Without the cash available, the record confirms that the Checks were funded with loans and the District Court properly refused to give "credit" to Mr. Barot's testimony that the funds for the Checks were wired from Creative Choice Homes, Inc. (Mr. Barot's company) with no loans involved.[23] (D.E. 173 at 18.)

---

[22] The General Partners then claim that "[a] conversation between counsel occurred before June 3, 2019" and that "follow-up calls to Mr. Griffith" by an unidentified person were made. (Appellants' Br., p. 32.) Nothing in the record supports this claim.

[23] As the District Court stated, "[a] central dispute at trial centered on whether the source of funds for the June 21, 2019 payment as to Fountainview was a simple

More specifically, the General Partners' June 3, 2019 email, Mr. Kakkar's July 3, 2019 email, Impro's interrogatory responses, and Baker Tilly's audit memo all confirmed that loans from Impro to the Partnerships were used to fund the Checks from the Partnerships. (D.E. 170-9, 170-14, 170-15, 171-49, 171-70.) The District Court properly considered all this evidence to find that the Checks were funded with loans from Impro, (D.E. 173 at 17), and further to find that a cure by a check funded with a loan was a further breach of the agreement and not a cure at all, (*Id.*). Any suggestion that the District Court committed "clear error" is misplaced.

A.    *The Evidence of Failure to Cure*
       *Fountainview Defaults Cannot Be Reasonably Contested.*

The General Partners curiously assert that the District Court erred in its finding that the Fountainview defaults were not cured because $54,000 was borrowed from Impro as a loan to cover outstanding distributions to the Limited Partners. (Appellants' Br., p. 44.) As noted, Mr. Kumar told Baker Tilly that Fountainview owed $54,500 to Impro for "short term loan" for "advances made from Impro to cover outstanding distributions" to the Limited Partners. (D.E. 171-70.) The 2019 audit for the Fountainview Partnership also revealed an Accounts Payable increase of $54,000 from 2018 to 2019 which was admitted to reflect the

_____

infusion of cash from Creative Choice Homes, Inc., or instead involved loans to the partnership, which would violate the partnership agreement and fail to cure the default." (D.E. 173 at 17.)

loan.[24]  (D.E. 171-68 at 4; D.E. 222, Tr., Vol. 2, 76:21-24.)  These are the General Partner's own records.

On appeal, the General Partner asserts two arguments regarding the Baker Tilly audit note: (1) the $54,000 loan relates to a different transaction, and (2) the audit note is hearsay.  (Appellants' Br., pp. 44-45.)

First, the $54,000 loan does not relate to a different transaction.  The plain language of the documents confirmed a loan was used to fund the Checks, and there can be no clear error given the support in the record for the conclusion.  And, the General Partner – neither at trial nor in its Brief to this Court – identifies the "different transaction" necessitating a $54,000 loan.  In addition, even if true, the General Partner was not permitted to cause the Partnership to borrow $54,000 for *any* purpose,[25] so that conduct would be grounds for removal in any event.

Second, the audit note is not hearsay – it was a Joint Exhibit, admitted into evidence by both parties, for all purposes, including for the truth of the matter asserted.  (D.E. 221, Tr., Vol. 1, 21:13-15.)  This Court should reject a belated attempt

---

[24] This Accounts Payable increase is consistent with the Baker Tilly's Payable – Aged Summary reflecting a $54,500 loan from Impro.  (D.E. 171-70.)  This defeats the General Partners' assertion that the "2019 audited financials … do not identify any outstanding loans or note receivable from Impro."  (Appellants' Br., p. 45.)

[25] The General Partner lacks the authority to "borrow in excess of $10,000.00 in the aggregate at any one time outstanding on the general credit of the Partnership."  (D.E. 171-1 at 54-55, § 8.2(b)(ii)).

to exclude from evidence a document that was entered with the consent of the parties, and for which no objection was lodged at trial.[26]

Finally, this argument does not refute the other, internal correspondence from the General Partners acknowledging the need to borrow money to fund the Checks and then referring to the amounts as loans themselves.  (D.E. 170-9, Def. Ex. 22; D.E. 171-70.)  In sum, the District Court's analysis of the Baker Tilly audit note and the $54,000 loan from Impro was not clearly erroneous.

> B.    *The Evidence of Failure to Cure*
> *Park Terrace Defaults Cannot Be Reasonably Contested.*

The General Partners assert that the District Court erred in finding the Park Terrace defaults were not cured even though "improper cash advances to affiliates continued in 2019 even after the May 3, 2019, notice of default, and these withdrawals were not paid back until November 2019."  (Appellant's Br., p. 45.) The General Partners assert that time was needed "to ensure this practice ended." (*Id.*)

No explanation is offered why the General Partners were not able to stop stealing right away.  More importantly, the General Partners' internal documents confirmed the District Court's findings: (1) the General Ledgers showed steady

---

[26] If an objection had been made, the document is still not hearsay because it is an admission of a party opponent, a business record, and further offered for impeachment purposes.  Fed. R. Evid. 801(d)(2), 803(6), 806.

transactions to take money, (2) internal email correspondence showed one payment in November of 2019, and (3) the General Partner directed Impro to disguise that November payment as having occurred in September. (D.E. 171-66, 170-10, 171-27; D.E. 222, Tr., Vol. 2, 86:14-91:24; D.E. 170, Def. Ex. 43, Excerpts 52-53.)

Now, the General Partners admit the November payment was backdated to September 2019. (D.E. 171-66.) But, the General Partners newly contend that the November 2019 transaction repaid withdrawals from the first six months of 2019 whereas the May 3, 2019 notice of default involved "amounts owed to the Park Terrace LPs in 2017 and 2018 only." (Appellants' Br., pp. 45-46.) So, the argument continues, the General Partners were actually doctoring Partnership financials to cure defaults of which the Limited Partners were not yet aware. There was no evidence of this theory presented at trial.

First, the Limited Partner wanted _all_ stealing to stop immediately, and its notice of default was intended to do just that – any construction of the notice as permitting limited stealing or unknown stealing to continue is outrageous. Second, the General Partner kept stealing, even after the notices of default were sent and even while this case was pending, so the suggestion that theft during the case was not relevant to removal is also misplaced. Finally, the very notion that the General Partner and Impro would continue their scheme after being caught and knowing that

they would be compelled to participate in discovery further validates the District Court's decision to remove them from the Partnerships.

C. *The General Partners' Belated Attempts to Shift Blame to the Limited Partners for Allegedly <u>Failing to Cooperate with a Cure Should be Rejected.</u>*

For the first time on appeal, the General Partners argue that the District Court erred by endorsing removal despite the Limited Partners' "refusal to cooperate with curative efforts during the cure period." (Appellants' Br., pp. 46-48.) The Court should reject this argument for the following reasons: (1) the Limited Partners have no duty to the General Partners on cure, (2) the Limited Partners could not frustrate a cure by the General Partners.

First, the Partnership Agreements are meticulous about the process for removal, but they do not impose any cooperation duties on the Limited Partners during the cure periods, and that is presumably why the General Partners did not present evidence on this point at trial. This new "lack of cooperation" claim is an improper afterthought and should be wholly disregarded. Such a finding would flip the onus from the party committing misconduct to the innocent partner, as the General Partners seek to do here.

Second, the defaults here were exclusively of the General Partners' making (they stole money). As such, the cure here was exclusively within the General Partners' hands (to pay it all back). The General Partners had the financial records

44

of the Partnerships and sole responsibility for their finances. They – and they alone – would have had the records to confirm just how much money was taken.[27]

In sum, the General Partners were provided with ample notice and opportunity to cure. The General Partners did not respond and ignored all warnings until their actual removal. Now, the General Partners seek to deflect in an attempt to reverse the Judgments confirming their removal. Accordingly, the District Court's finding that no cures occurred was not clearly erroneous.

### III. The District Court's Factual Finding that the General Partners' Defaults Were Material Was Correct, Perfectly Consistent with the General Partners' Own Testimony and Not Clearly Erroneous.

As a preliminary point, materiality is not a necessary showing for removal based on the language of the Partnership Agreements. But, if it were, the Court should reject the General Partners' arguments because (1) the parties testified the amounts were material, (2) the nature of the conduct was material, and (3) the General Partners' theory is unsupported by evidence. At the outset, the Court is to "give effect to the plain language of contracts when that language is clear and unambiguous." *Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1242 (11th Cir. 2009); *Solymar Invs., Ltd. v. Banco Santander S.A.*,

---

[27] The General Partners cite cases which are inapposite because they do not involve the expressly bargained-for contractual rights to remove a general partner for default arising from theft.

672 F.3d 981, 991 (11th Cir. 2012). Courts are also not allowed to "rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relief one of the parties from the apparent hardship of an improvident bargain." *Id*. at 1297.

In Fountainview, the parties agreed that removal could occur for "any intentional misconduct, malfeasance, fraud, act outside the scope of its authority, [or] breach of its fiduciary duty . . . ." (D.E. 171-1 at 65, § 8.15(a)(i).) The removal provision goes on to require materiality only for removal based on "failure to exercise reasonable care with respect to any material matter in the discharge of its duties and obligations as General Partner" and such "failure to exercise reasonable care" is the "violation"[28] referenced in the parenthetical at the end of the removal provision. (*Id.*.)

In Park Terrace, the parties agreed that removal could occur after a "Material Default," which the parties then agreed to define as the General Partner committing "gross negligence, fraud, willful misconduct, misappropriation of Partnership funds, or a breach of fiduciary duty . . . ." (D.E. 171-3 at 83, § 12.7(C).) The parties expressly agreed this conduct would be considered material, by its very nature.

---

[28] If materiality was to apply to all enumerated grounds of removal, then the drafters would have used the word "violations" to refer to the various enumerated bases preceding the parenthetical, as opposed to using the word "violation".

Even if the materiality is required, the District Court properly evaluated the evidence to find that the General Partners' defaults were material:

1.     Mr. Barot considered the amount of money taken to be material, (D.E. 222, Tr., Vol. 2, 19:12-19);

2.     Mr. Kagey considered the amount of money taken to be material and the misconduct to be material as well, (D.E. 223, Tr., Vol. 3, 73:10-25, 74:17-75:18);

3.     Baker Tilly considered the Affiliate Balances to be material, (D.E. 171-12 at 1; D.E. 171-24 at 1);

4.     The misappropriated cash constituted a substantial portion of the available cash, (D.E. 222, Tr., Vol. 2, 66:18-67:22; 67:23-69:22); and

5.     The nature of the General Partners' misconduct was material.  (D.E. 173 at 20; D.E. 223, Tr., Vol. 3, 74:17-75:18.).

With all parties and the Partnership's auditor taking the position the amounts are material, it seems incredulous to assert the District Court committed clear error in simply agreeing with the uniform testimony of the witnesses.  Additionally, in the LIHTC context, less egregious breaches of a partnership agreement _are_ material breaches warranting removal.

In *Alliant Tax Credit Fund XVI, Ltd. v. Thomasville Community Housing, LLC*, No. 11-2234, 2013 WL 321548, at *5-6 (N.D. Ga. Jan. 28, 2013)*,* the plaintiffs-limited partners alleged that while the partnerships' general partners provided audited financial statements for the partnerships at issue, they failed to provide them from a qualified accountant.  The court found such a breach was material:

[The] Court necessarily rejects defendants' argument that § 13.3(D) is not a material provision of the LPAs. The requirement that defendants provide audited yearly financial statements is essential to plaintiffs' ability to monitor their substantial investment in the [the partnerships]. The Court likewise rejects defendants' argument that their breach of § 13.3(D) was not material because plaintiffs suffered no harm. Plaintiffs have produced evidence that they were in fact harmed by the alleged breach. In any event, the LPAs do not require harm or actual damages as a condition precedent to finding a "material breach." (LPAs [34] at § 11.4(A)(i)(c)).

2013 WL 321548 at *5. The court continued:

There is additional evidence to support plaintiffs' claim that defendants committed other material breaches of the LPA, any one of which might have resulted in a Major Default. In particular, plaintiffs have produced evidence, albeit inconclusive, that defendants overpaid themselves and underpaid plaintiffs approximately $90,000 between 2008 and 2010.

*Id.* at *6. The court further observed that the general partners' denial of any "impropriety" in the improper distribution of cash flow was immaterial – all that mattered was whether the "defendants misallocated or made unauthorized distributions of partnership assets." *See id.* The same analysis applies here.

Here, the District Court properly noted the Partnership Agreements do not measure materiality "only by comparing the amount misappropriated to the value of the property as a whole or the overall economic benefit to the Limited Partners" and the "amount of money taken is [not] the sole consideration." (D.E. 173 at 27.) The

District Court aptly observed that the effect on the Partnerships measured through the rupture of the partnership relations was also a relevant factor.[29]  (*Id.*)

In particular, the District Court found that the "General Partners repeatedly, intentionally, and willfully diverted thousands of dollars to non-partnership uses, over the objection of the Limited Partners, in violation of their duties as General Partners.  The District Court also found that the "General Partners' actions with respect to the affiliate loans were intentional and willful."

By contrast, the General Partners suggest a different analysis based on whether the Limited Partners received the tax credits (which are just one of the economic benefits a Limited Partner expects).  That analysis, if accepted, would grant free license to General Partners to –literally – steal anything and everything from a Partnership so long as tax credits continued to flow.  Such a construction of the Partnership Agreements would lead to absurd consequences and require reading entire Sections of the Agreements out of the contracts,[30] and the types of misconduct a partner owning only .01% of the equity could commit are limitless.

---

[29] Similarly, the evidence conclusively showed that the General Partners' theft knew no bounds, as they stole security deposits from low-income housing tenants even after this dispute had begun.  *See supra* nn. 11 & 12.  It is difficult to imagine a default more material than stealing from the tenants of the affordable housing one is entrusted to manage.

[30] Courts do not employ an interpretation of a contractual provision that would lead to an absurd result.  *See Interline Brands, Inc. v. Chartis Specialty Ins. Co.*, 749 F.3d 962, 966 (11th Cir. 2014) ("Under Florida law, 'if one interpretation looking to

The District Court rejected the General Partners' "tax benefits" argument and made specific factual findings based on the testimony that "[i]t was important from the Limited Partners' perspective that funds remain in the partnership throughout the year in order to be available for emergencies and other unexpected events that might arise during the year." (D.E. 173 at 20.) But even under the material breach of contract standard, the District Court concluded that the General Partners' misconduct was material because it violated the Limited Partners' expectations that the General Partners "would adhere to their most basic fiduciary duties by refraining from diverting partnership funds to their own, non-partnership purposes," thus depriving the Limited Partners "of that substantial, bargained-for benefit." (D.E. 173 at 28.)

As the record demonstrates, the General Partners engaged in a pattern of intentional misconduct that involved theft, concealment of theft, creation of fraudulent documents to mask the theft, repeated failures to distribute cash flow in violation of the Partnership Agreement, as well as improper handling (and in at least one case, doctoring) of the Partnerships' records. The General Partners' misconduct was material because it was contrary to the Limited Partners' expectations that the General Partners would manage the Partnerships according to the ground rules

_____

the other provisions of the contract and to its general object and scope would lead to an absurd conclusion, such interpretation must be abandoned, and that adopted which will be more consistent with reason and probability.' " (quoting *Inter-Ocean Cas. Co. v. Hunt*, 189 So. 240, 243 (Fla. 1939))).

outlined in the Partnership Agreements, namely, without abusing their broad and exclusive authority and without misappropriating partnership funds or using the Partnerships' bank accounts as personal piggy banks. (D.E. 222, Tr., Vol. 2, 180:4–21.) Due to their repeated misconduct, the General Partners ruptured the partnership relationships with the Limited Partners—thus affecting the Partnerships overall, such that it became impossible for the Limited Partners to trust and do business with the General Partners. (D.E. 223, Tr., Vol. 3, 60:1-25.)

Finally, at trial, the General Partner agreed that the Partnerships' cash was required to stay in the partnership until year-end since cash flow distributions were not earned until the end of each year. (D.E. 222, Tr., Vol. 2, 200:7-24.) The recurring theft of partnership funds resulted in less cash flow available for distribution to the Limited Partners at year-end, and less money for capital improvements, property upkeep, and maintenance. (D.E. 221, Tr., Vol. 1, 91:13-92:6; D.E. 222, Tr., Vol. 2, 195:19-196-18, 198:2-10.) Accordingly, the District Court's finding that the defaults were material was not clearly erroneous.

### IV. The District Court's Factual Finding that Contractually Agreed Removal of the General Partners Would Not Cause Forfeiture Was Correct.

The General Partners urge this Court to find that removal constitutes an impermissible forfeiture. The Court should disagree because (1) there is no forfeiture, (2) even if there were, forfeiture is permitted if agreed by contract, (3) the

cases cited are inapplicable to the misconduct at issue, and (4) no party obtains a windfall from the removal.

First, under the Partnership Agreements, the General Partners' equity interests are not "forfeited;" they are required to be purchased, using a specific formula, to which the General Partners agreed.. (D.E. 171-1 at 66, 51-53, §§ 8.15(C) & 6.3; D.E. 171-3 at 82-87, §12.7.) Second, the District Court properly concluded that the remedy of removal "is provided for by the parties' agreements, and any loss of equity will have resulted from the General Partners' failure to comply with the terms of those agreement and their legal responsibilities, matters which were within their own control." (D.E. 173 at 29.) Consequently, the District Court ruled that removal would not result in an impermissible or inequitable forfeiture. (*Id*.)

"Although forfeitures are not favored, the law permits a person to make a contract that will result in a forfeiture." 11 Fla. Jur 2d Contracts § 227 (June 2021 Update); *Stoltz v. Truitt*, 940 So. 2d 521, 523 (Fla. 1st DCA 2006) (citing *Nelson v. Hansard*, 197 So. 513, 513–14 (Fla. 1940)) ("While forfeitures are not favored, a forfeiture will be enforced where it is clear that the parties intended such a result"); *see also Waksman Enters., Inc. v. Oregon Props., Inc.*, 862 So. 2d 35, 41–42 (Fla. 2d DCA 2003) ("the law abhors a forfeiture" may not "be used to justify an interpretation of a contract that ignores the plain meaning of the text of the contract."). As Florida law requires, all provisions—including the express removal

provisions—must be given meaning and effect; they cannot somehow be disregarded. *Stinson, Lyons, Gerlin & Bustamante, P.A. v. Brickell Bldg. 1 Holding Co., Inc.*, 923 F.2d 810, 813 (11th Cir. 1991); *Florida Polk Cnty v. Prison Health Services, Inc.*, 170 F.3d 1081, 1084 (11th Cir. 1999).

Third, the cases the General Partners cite are both irrelevant and distinguishable as they do not involve contractually bargained-for removal rights and comparable fact patterns. For example, *Torres v. K-Site 500 Associates*, 632 So. 2d 110 (Fla. 3d DCA 1994) involved an alleged forfeiture of a deposit under a mortgage financing agreement, whereas *White v. Brousseau*, 566 So. 2d 832 (Fla. 5th DCA 1990), was an action for quiet title involving issues relating to equitable redemption of land from consequences of default in payment of debt secured by the land, and *Varel v. Banc One Capital Partners, Inc.*, 55 F.3d 1016 (5th Cir. 1995) involved a dispute over the non-performance of a condition precedent to a right of first refusal. None of these cases involved a partner stealing partnership cash.

Similarly, the General Partners' other cited cases relating to contract termination and prejudice are plainly irrelevant. The Limited Partners' removal rights do not terminate the Partnership Agreements as new general partners will be appointed. (*See* D.E. 171-1 at 67, § 8.15(b); 171-3 at 85-86. § 12.7G.) In addition, by terms of the Partnership Agreement, the removal rights are not predicated on prejudice to the Limited Partners, but only (at most) a detriment to the Partnerships

and the Partnerships' assets – which the District Court found to have been met by the materiality of the misappropriated amounts.

Finally, the General Partners' assertion that their removal results in a windfall is incorrect. At the outset, the root cause of any change in economics is the General Partners' misconduct, not the Limited Partners election to invoke the contractual remedy for it. Further, there is no windfall to Limited Partners who are required, through no fault of their own, to cause the General Partners' interests to be acquired and then have hoisted upon them the General Partners' duties – after the removed General Partners have already realized over $9,000,000 in returns on their $200 investment. The Court should reject this argument.

Accordingly, the District Court's finding that removal did not result in impermissible or inequitable forfeiture was clearly erroneous.

## V. The District Court's Factual Finding that No Waiver or Estoppel Occurred Is Not Clearly Erroneous.

The District Court found that no waiver or estoppel of the Limited Partners' removal rights occurred due to failure "to do so on earlier occasions." (D.E. 173 at 11.) Waiver is the voluntary and intentional relinquishment of a known right or conduct which implies the voluntary and intentional relinquishment of a known right. *Major League Baseball v. Morsani*, 790 So. 2d 1071 (Fla. 2001). The elements of waiver are: (1) the existence of a right which may be waived; (2) actual

or constructive knowledge of the right; and (3) the intent to relinquish the right. *E.g., Capital Bank v. Needle,* 596 So. 2d 1134, 1138 (Fla. 4th DCA 1992).

Citing no trial testimony or evidence of "intent" to relinquish any rights by the Limited Partner or detrimental reliance and change in position by the General Partners, the General Partners assert—in a conclusory manner—that the Limited Partners' not pursuing removal earlier "led [the General Partners] to reasonably believe removal would not occur based on the Advances, accrual of fees and priority distributions, or late reporting." (Appellants' Br., p. 61.) However, the Limited Partners never approved the General Partners' misconduct and repeatedly brought it to the General Partners' attention. (D.E. 222, Tr., Vol 2., 176:8-17; 190:18-191:11.) And, even more simply, the General Partners refused to cure when given the chance through formal notice and extensions.

Similarly, "[e]quitable estoppel presupposes a legal shortcoming in a party's case that is directly attributable to the opposing party's misconduct." *Major League Baseball,* 790 So. 2d at 1077. The elements of equitable estoppel are: (1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon. *State Dep't of Revenue v. Anderson,* 403 So. 2d 397, 400 (Fla. 1981).

The Fountainview Partnership Agreement expressly states that there can be no continuing waiver of subsequent breaches. (D.E. 171-1 at 90, 96, §§ 14.1, 16.9.) As a result, the express contractual language clearly defeats the General Partners' waiver and estoppel arguments in Fountainview. Further, as the District Court elaborated in denying reconsideration: the "failure to remove … did not reasonably suggest or cause the General Partners to reasonably believe that their conduct complied with the parties' agreements or that the Limited Partners had abandoned the right to remove them if the misconduct persisted—which it did." (D.E. 216 at 4.) Additionally, there is no evidence (and it was rejected by the District Court, to the extent presented) of any representation, any reliance on it, or a change in position because of it. Accordingly, the District Court's finding should be affirmed.

## CONCLUSION

The General Partners stole hundreds of thousands of dollars from two Partnerships and were caught. Then, they created fraudulent documents to cover up their theft, and were caught. Then, instead of repaying the money, they committed more defaults in an attempt to alter financial records to suggest a cure actually did occur. The District Court heard all the evidence and came to the only logical conclusion, which this Court should affirm.

Ultimately, the Appellants' brief re-urges arguments about the factual background that were rejected by the finder of fact. In this posture, in the absence of any legal issue on which to base reversal, this Court should affirm in all respects.

Respectfully submitted,

/s/ Steven F. Griffith, Jr.
Steven F. Griffith, Jr.
Laura E. Carlisle
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, P.C.
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
(504) 566-5200
sgriffith@bakerdonelson.com

Desislava K. Docheva
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, P.C.
100 S.E. Third Avenue, Suite 1620
Fort Lauderdale, FL 33394
(954) 768-1600
ddocheva@bakerdonelson.com

ATTORNEYS FOR ALL APPELLEES

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because this document contains less than 13,000 words – more specifically, it contains 12,898 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman.

Dated:  August 28, 2023

*/s/ Steven F. Griffith, Jr.*
Steven F. Griffith, Jr.

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2023 I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Steven F. Griffith, Jr.*
Steven F. Griffith, Jr.
